720 A.2d 1232

**In re LEVON A.**

**No. 205, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

Dec. 3, 1998.

Mark Colvin, Assistant Public Defender (Stephen E. Harris, Public Defender on the brief), Baltimore, for appellant.

Mary Ann Ince, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, and Patricia Jessamy, State's Attorney for Baltimore City on the brief), Baltimore, for appellee.

Argued before HARRELL and HOLLANDER, JJ., and ALBERT J. MATRICCIANI, Jr., Judge, Specially Assigned.

HOLLANDER, Judge.

In the Circuit Court for Baltimore City, Levon A., a juvenile, was found to have committed the delinquent act of unauthorized use of a motor vehicle. At the time of the offense, Levon was fourteen years old. Levon was thereafter placed on probation, and he and his mother, Ruth A.[1], were ordered to pay restitution of $443.73 to the owner of the vehicle. In addition, Ms. A. was ordered to pay restitution of $1,690.17 to the owner's insurance company, State Farm Mutual Automobile Insurance Company ("State Farm").

On appeal, we are asked to consider one question: "Did the juvenile court err in ordering Levon and his mother to pay restitution totalling $2,133.90?"[2] For the reasons that follow,

---

1. Ms. A.'s first name appears in the transcript and various court documents as "Charrise" or "Charise." On direct examination, however, Ms. A. said her name was "Ruth."

2. As we shall discuss, *infra*, Levon and Ms. A. claim that they are both appellants herein. The State disputes that contention as to Ms. A. As we agree with Ms. A., we shall hereinafter refer to Levon and Ms. A. as appellants.

we are convinced that it did. Accordingly, we shall vacate the order of restitution and remand to the circuit court for further proceedings. We shall also deny the State's "Motion to Strike Appendix to Appellant's Reply Brief", in which the State complains about a six-page excerpt of the transcript from the exceptions hearing that was appended to the reply brief.

## Factual Background

Levon was charged in a delinquency petition with various offenses stemming from his alleged involvement in October 1996 in the theft and unauthorized use of a 1993 Jeep Grand Cherokee, including theft over $300, in violation of Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 342; unauthorized use, in violation of Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 349; and malicious destruction of property, in violation of Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 111. An adjudicatory hearing was conducted by a juvenile master on February 28, 1997, at which several witnesses testified. What follows is a summary of the evidence adduced at the hearing.

H. Edward Andrews III, an attorney, was the owner of the Jeep. He testified that on the morning of October 17, 1996, he drove his automobile to the District Court located on North Avenue in Baltimore City to meet with a prosecutor about a case. At about 9:15 a.m., Andrews parked his vehicle on a street behind the courthouse, secured it with "The Club," locked the doors, and went inside. When he returned approximately forty-five minutes later, the Jeep was gone. Andrews immediately reported the missing vehicle to a policeman inside the courthouse.

Later that evening, Andrews learned that his automobile had been involved in a police chase involving two juveniles. When Andrews recovered his Jeep at a Baltimore City impoundment lot, he observed that it was damaged on the front and right side, the ignition was missing, and glass from the right rear passenger window littered the seat and floor. Moreover, audio tapes that had been in the glove compartment were damaged, and "The Club," approximately seventy dollars in cash and coins, a wool blanket, and a mug, were missing.

On November 27, 1996, Andrews filed a Notice of Claim for Restitution.

Baltimore City Police Officer Anthony DiNunno testified that on the afternoon of October 17, 1996, he was in an unmarked car when he saw two boys who were too short "to see over the dashboard," driving a Jeep Grand Cherokee southbound in the 4700 block of Harford Road. After verifying that the Jeep had been reported as stolen, the officer called for backup and followed the vehicle. In an attempt to evade police, the vehicle "smashed" into a wooden fence and "crashed" into trees and shrubbery at the end of a private driveway. The "vehicle [landed] in an upright position with the front wheels off the ground." The driver, fifteen-year-old Antonio John M. (John), ran from the Jeep but was apprehended nearby. Appellant, who was the passenger, was arrested before he was able to exit the vehicle.

Levon testified that while walking home from school on October 17, 1996, he saw his friend, John, driving a Jeep, and John offered Levon a ride home. Levon thought his friend was old enough to drive, and that the Jeep belonged to one of John's relatives, because John's family owned several cars, including a Cadillac, a station wagon, and a truck. When Levon entered the vehicle, he claimed he did not know it had been stolen, nor did he notice the broken window or the missing ignition.

According to Levon, before John drove Levon home, John stopped at his mother's house. Levon claimed that John told him the car was stolen when they were leaving John's house. Because Levon thought John was "playing with [him]", he did not ask John to stop the car and let him out. When Levon noticed a police car following them, however, he understood that John was serious. Levon explained:

> On the way from his house, he was going to drop me off at my house, so he seen the police. He's like, the police is behind us. And I was like, so? He was like, it's stolen. Then that's when I knew, because he had told me before,

about his plans. Then when he started turning and stuff, that's when I knew he was going to wreck.

At the conclusion of the hearing, the master found that Levon had committed the offense of unauthorized use. As to the remaining counts, the master found "facts not sustained."[3] The master said, in part:

The evidence in this matter is fairly clear. This young man was told that the car was stolen. He thought that [John] was joking. The window, the vent of the window was broken. The ignition was broken, although this young man said he didn't see it. He had an opportunity to see it from his vantage point in the front seat. The Respondent at least in this matter should have known the car was stolen.

On March 25, 1997, the master held a restitution hearing at which Levon was represented by counsel.[4] Although Levon's mother was present, she did not have an attorney. Three witnesses testified: Andrews; Patricia Welch, a Claims Specialist for State Farm; and Ms. A. Andrews and State Farm claimed a total of $2,174.40 in damages.

Welch testified that the insurer paid Andrews $1,690.17 to repair the Jeep. The repairs included 1) a new front bumper cover; 2) a new ignition lock cylinder and switch assembly; 3) new weatherstripping; 4) a new rear passenger window; and 5) replacement of a decal on the front quarter-panel. Andrews testified that the items inside the vehicle that were missing or damaged had a value of $484.23, as follows:

| | |
|---|---|
| The Club | $ 42.00 |
| Wool Blanket | $ 40.00 |
| Mug | $ 7.50 |
| Cash and Coins | $ 70.00 |
| 37 Tapes | $324.73 |

---

3. Count Two, charging theft under $300.00, was dismissed at the end of the State's case.

4. The master held a separate disposition hearing on May 13, 1997, and recommended six months of supervised probation. No exceptions were noted as to that recommendation, which the juvenile court adopted on May 21, 1997. Accordingly, the probationary disposition is not at issue here.

Andrews arrived at the values of "The Club," blanket, mug, and tapes based on the original cost of the items or by ascertaining the current replacement cost for the items. For example, he determined the price of "The Club" by going to Wal–Mart, where he had purchased the item two years before the incident, and noted that the same model now sells for $42.00. The blanket was purchased in Scotland at a cost of $40.00. With regard to the cash that was in the vehicle when the offense occurred, Andrews testified that in August 1996, his daughter counted the money in his ashtray and found that he had $84.80. He estimated that he had used $14.80 for tolls and parking since that time, leaving a total of $70.00 in the vehicle at the time of the incident.

At the time of the restitution hearing, Ms. A. lived in an apartment with Levon and three of her other children, ages 10, 12, and 16.[5] Between the time of Levon's delinquent act and the time of the adjudicatory hearing, however, Ms. A.'s children were in foster care, because there was no room for the children at Ms. A.'s mother's house, where Ms. A. was living at the time. According to Ms. A., her children all have the same father, but he has no contact with them, and is "thousands" of dollars in arrears with regard to child support. Indeed, Ms. A. testified that she has never received assistance from him. Ms. A. also acknowledged that she is a former addict, and she had been incarcerated for a drug offense some three years prior to the restitution hearing.

At the time of the restitution hearing, Ms. A. was employed as a housekeeper at Kernan Hospital, where she was earning $6.00 an hour. She indicated that she did not receive any additional social service benefits or a housing subsidy. According to Ms. A., her take-home pay was $197.00 a week. From that amount she paid the following monthly expenses: $300.00 for rent, $200.00 for food, approximately $50.00 for the telephone, $75.00 in utility fees, and $80.00 for work-related

---

5. Ms. A. testified that she has another child who is "not dependent" on her.

transportation. Ms. A. explained that what she spent for clothing and other items "varie[d] because I can't give them things or everybody something. Like this month, it has to be one this month and then next month and like that."

The master advised Ms. A. that the court could assess restitution against her as well as Levon. He then asked Ms. A. if there was anything she would like to add. The following colloquy ensued:

MS. A.: Only that I'm struggling, you know, I am clean and that's going on three years now. I'm doing the best that I can trying to raise these children by myself. Their father has nothing to do with them. He sends them nothing. He don't see them.

THE MASTER: Well, let me ask. Has there been any order of child support passed in this matter?

MS. A.: Oh, yes. I mean, I have been on Social Services. I was there the majority of the time, and I did take him downtown for all of them, you know, but I have never received a check whatsoever, no child support—

THE MASTER: Do you know how much he's in arrears, how much he owes?

MS. A.: All I know is thousands, the last that I know. I had got a letter from the Bureau of Child Enforcement, but that's been a few years ago.

During her closing argument, Levon's counsel urged the court not to assess restitution against either Levon or his mother. Moreover, relying on *In re Jason W.*, 94 Md.App. 731, 619 A.2d 163 (1993), defense counsel said that she did not believe the damage to the Jeep was caused by Levon's misconduct.

Thereafter, the master recommended that Levon and his mother, "along with any other responsible party," pay $443.73 in restitution to Andrews over a period of eighteen months. The master also recommended that Ms. A. pay restitution to

State Farm in the amount of $1,690.17.[6]

Although the master found as to Levon that "the restitution amount [was] in order as to the club, the blanket, the mug, the tapes and the cash," he reduced the value of the tapes from $324.73 to $291.43.[7] In ordering Levon to pay restitution, the master believed that Levon could soon secure employment. He said:

> Well, you know, I expect what's going to happen is, he will be sixteen by the time this restitution ends up rolling around and being completed. I expect him at the time that he becomes fifteen to become employed, to search for employment. I don't expect him to sit on his rusty-gusty and not do anything. That gives him an adequate amount of time for him to become legally able to work. This gives him an adequate amount of time for him to make sincere attempts to pay the money, and that gives the court an adequate amount of time to make a determination as to whether he's making those sincere attempts, and to make adjustments to the restitution if it's necessary.

Acknowledging that Ms. A.'s job "doesn't pay that much," and that he "[had] to decide how much food [he's] going to take out of her children's mouths," the master nonetheless recommended that the restitution order against Ms. A. be reduced to judgment immediately. The master explained:

> The real question is why we're here right now talking about this money. Why? Because this young man hopped into a vehicle that he knew was stolen. That's the reason

---

6. The master's proposed order of March 25, 1997, obligated Levon to pay restitution to the vehicle's owner *and* to the insurer, although the master had stated that he would recommend that only Ms. A. pay restitution to State Farm. Consequently, the master corrected his proposed order on September 2, 1997, to impose only on Ms. A. the obligation to pay restitution to State Farm.

7. The $33.30 reduction was calculated by subtracting the value of one of the mid-priced tapes, which Andrews testified had been left unharmed in the tape deck, and then subtracting five percent from the remaining balance.

we're here today. No other reason. And now somebody has got to pay some money.

There's a causal nexus in this because the court, the legislature as a matter of public policy in unauthorized use cases is [sic] that all people involved in the vehicle diminishes [sic] in some way the use of the vehicle. The court can't make a determination as to—the court can never under these circumstances make a determination as to who got into the vehicle, when they were driving it, et cetera. So, the court makes a determination in these matters that these people are as lawbreakers equally responsible for the damages done to the vehicle.

After the master announced his recommendation, appellant's counsel objected, focusing on the lack of a causal connection between the damages and Levon's participation, and the inability of Levon and Ms. A. to pay restitution. The following colloquy ensued:

APPELLANT'S COUNSEL: Can I ask you what causal link you find between the respondent's actions and this damage?

THE MASTER: I have already explained that, [counsel], the best way I possibly can.

APPELLANT'S COUNSEL: For the record, I don't, I don't think that's enough.

THE MASTER: That's fine, [counsel].

\* \* \*

APPELLANT'S COUNSEL: Okay. And how—the respondent at age 14 with no employment, how is he expected to come up with $443.00—

THE MASTER: He's expected to use his—

APPELLANT'S COUNSEL: —in eighteen months?

THE MASTER: I expect he is expected to use his ingenuity in the same way that he hopped into this vehicle, just to use this person's car, to use his ingenuity, to make an attempt to pay the money. No attempt being made to pay

this money will cause him to be in violation of probation if he's, in fact, placed on probation in this matter.

\* \* \*

APPELLANT'S COUNSEL: In regard to the judgment against Mom, for the total insurance amount—

THE MASTER: Yes?

APPELLANT'S COUNSEL: —you're saying that because—

THE MASTER: What I'm saying is this. Unfortunately—

APPELLANT'S COUNSEL: —of her past, you're holding her past against her?

THE MASTER: Unfortunately, unfortunately. She straightened herself out, but it's this court's opinion that if you have children, they have to be properly cared for; there has to be some sort of supervision for the children so these children don't end up in court. This young man has obviously had some problems and difficulties, but those difficulties are solely his own. He's in court because of the actions of his mother and father. His father is not here. I can't do anything with his father, and I think the mother should go up here and try to get this money from this man, who decided to dump her and these children like a piece of garbage. That's what I think.

On April 1, 1997, Levon filed a Notice of Exception to the master's recommendation "regarding restitution," contending that the State "failed to prove that the delinquent act was the cause of the car owner's damage or loss." Further, he asserted that the master failed to consider Levon's "age and circumstances" in ordering restitution.

At a hearing held on October 15, 1997, the circuit court considered appellant's exceptions with regard to restitution. Neither Levon nor his mother attended the hearing, but an attorney from the Office of the Public Defender appeared on behalf of Levon.[8] The court indicated that it did not believe

---

8. Levon's attorney at the exceptions hearing was not the same person who represented him at the restitution hearing. Although the tran-

the exceptions encompassed a challenge by Ms. A. to the order of restitution. "Just in case," however, the court proceeded to consider and address the master's recommendation as to restitution by Ms. A. The court said, in part:

[I]nitially I thought that the defense was challenging the award of restitution as to the mother, but that does not appear to be so. But just in case—and there was no argument on that other than the award—[Levon's counsel] raised in her argument the amount which was 1 thousand 690 dollars and 17 cents. There was extensive testimony taken by [the master] concerning the mother's place of employment, her prior job situation, the fact that she had three children living with her. . . .

\* \* \*

[T]here was an extensive hearing. There was quite a bit of testimony taken and afterwards, [the master] ruled that the mother should, in fact, because she was in custody of the respondent at the time of this incident, should be ordered to pay 1 thousand 690 dollars and 17 cents. Court [sic] concurs with that recommendation.

With respect to the proposed order requiring Levon to pay $443.73 to the victim within eighteen months, the court concluded that the recommendation was "appropriate." Accordingly, by order dated October 15, 1997, the juvenile court overruled the exceptions. The court's order "affirmed" the master's recommendation of March 25, 1997. Further, the order said: "Respondent and parent to pay the restitution as stated in previous ordered [sic] made on 3/25/97." [9] This appeal followed.

We will include additional facts in our discussion.

script reflects that the judge was quite familiar with the arguments advanced before the master, neither counsel for the State nor counsel for Levon made any arguments with respect to the issues at the exceptions hearing. Indeed, Levon's attorney merely identified herself for the record, and the prosecutor just summarized the master's rulings.

**9.** In its brief, the State notes that on September 2, 1997, the master "corrected" his proposed order of March 25, 1997. *See* footnote 6,

### Discussion

### I.

Preliminarily, we must determine whether Levon alone is the appellant, or whether his mother, too, is an appellant herein. Levon's counsel noted an appeal from the judgment of restitution, but did not identify the particular parties lodging the appeal. The notice of appeal provided: "Please enter an appeal to the Court of Special Appeals of Maryland from the judgment regarding restitution entered in the above-captioned case." In a footnote in appellants' brief, Levon and Ms. A. assert that this "appeal is, in fact, on behalf of both Levon and his mother." The State challenges that assertion as to Ms. A., because she never filed exceptions to the master's recommendation. If the State is correct, our review would be limited to the propriety of the court's order requiring Levon to pay restitution to the owner of the vehicle in the amount of $443.73; we would have no basis to review the court's order requiring Ms. A. to pay $1,690.17 in restitution to State Farm, and making her jointly liable with Levon for the restitution due to the owner. For a variety of reasons, we disagree with the State.

It is true that after the restitution hearing conducted by the master, a Notice of Exception was filed only on behalf of Levon. Ms. A.'s appellate status does not turn on her failure

---

*supra.* The State also indicates that, on October 15, 1996, the court adopted the master's proposed order of March 25, 1997, "as amended," although the order of October 15, 1997, does not so indicate. Moreover, in our review of the record, we note that, on September 10, 1997, the juvenile court actually signed the master's corrected proposed order of September 2, 1997. Yet that order is not reflected on the docket sheet. The text of the order of September 10, 1997, effectively implements the master's proposed order of March 25, 1997, as revised. The order of September 10, 1997, indicates that it is a "corrected order", it "incorporate[s]" facts of the March 25, 1997 order, and it "supercedes" [sic] the order of March 25, 1997.

The parties have not raised the matter of the September 10, 1997 order here. Moreover, at the exceptions hearing, neither counsel nor the court referred to the order of September 10, 1997. In any event, we are satisfied that the order at issue here is the one that was executed after the exceptions hearing.

to note an exception, however. The only judgment from which an appeal could have been taken is the one from which the appeal was taken.

In our view, the State has conflated the issue of preservation of an issue for appellate review with the right to take an appeal from a final judgment. "Appellate jurisdiction ... is [ordinarily] limited to review of final judgments." *Anderson v. Anderson*, 349 Md. 294, 297, 708 A.2d 296 (1998); *see* Md.Code (1974, 1995 Repl.Vol.), § 12–301 of the Courts & Judicial Proceedings Art. ("C.J."). Clearly, the report of the juvenile master was not a final order of the circuit court, *In re Michael G.*, 107 Md.App. 257, 264, 667 A.2d 956 (1995), and neither Levon nor Ms. A. was entitled to take an appeal from it. Maryland Rule 11–111(a)(2), which pertains to masters in juvenile causes, provides: "The findings, conclusions and recommendations of a [juvenile] master do not constitute orders or final action of the court."

The State has not presented us with any authority for the proposition that, in a case involving a juvenile master, no appeal may be taken from a judge's final order adopting a master's recommendation, unless the party previously challenged the master's report by way of exceptions. Our construction of Md. Rule 11–111 does not support that view.

The canons and rules of construction that guide the interpretation of statutes apply equally when interpreting rules of procedure. *State v. Harrell*, 348 Md. 69, 79, 702 A.2d 723 (1997); *Long v. State*, 343 Md. 662, 684 A.2d 445 (1996). In ascertaining the intention of the Court of Appeals in promulgating the rule, we look first to the words used in the rule. When the language of the rule is clear and unambiguous, we construe the words in accordance with their plain meaning. *In re Victor B.*, 336 Md. 85, 94, 646 A.2d 1012 (1994).

Maryland Rule 11–111(c) expressly states that any party "*may* file exceptions to the master's proposed findings, conclusions, recommendations, or proposed orders." (Empha-

sis added). But the rule does not mandate that a party who disagrees with the master *must* file exceptions in order to preserve a right to appeal from the judge's subsequent order. Indeed, Rule 11–111(d) does not require the judge to adopt the master's determinations, even when the master's recommendations or proposed orders are unchallenged. Md. Rule 11–111(d) states: "In the absence of timely and proper exceptions, the master's proposed findings of fact, conclusions of law and recommendations *may* be adopted by the court and the proposed *or other appropriate* orders may be entered based on them." (Emphasis added). Further, even if no exceptions have been filed, Rule 11–111(d) permits the juvenile court to remand the matter to the master for a further hearing. The court may also conduct "a further hearing supplemented by such additional evidence as the court considers relevant and to which the parties raise no objection."

What the State has overlooked is that it is the *judge's* final order, not the master's report, recommendations, or proposed order, that both Ms. A. and Levon have challenged here. In particular, regarding the issue of restitution, Ms. A. alleges that the judge was required to exercise his discretion with respect to Ms. A.'s financial circumstances, evidence of which was adduced at the master's hearing. Further, she claims that, in ordering her to pay restitution, the judge abused his discretion. Ms. A.'s quarrel, then, is not with the master's fact-finding.

Our decision in *Miller v. Bosley,* 113 Md.App. 381, 688 A.2d 45 (1997), is instructive. *Miller* involved an order granting *pendente lite* custody of a child to the paternal aunt, based on the report and recommendation of a domestic master. Although the child's mother failed to note exceptions to the master's report, she lodged an appeal to this Court, challenging the trial judge's decision. On appeal, the father argued that the mother's "failure to file exceptions forecloses her objection on appeal to the master's recommendations ....", which were the basis of the lower court's orders. 113 Md.App. at 390 n. 8, 688 A.2d 45. We disagreed. What we said in *Miller* is pertinent here:

We perceive that appellant assigns error not to the master, but to the trial judge in his exercise of his judicial responsibilities. Although exceptions are the proper vehicle for review of the master's findings, this appeal may properly consider the propriety of the judge's actions.

*Id.*

*In Re Zephrin D.,* 69 Md.App. 755, 519 A.2d 806 (1987), is also pertinent. There, we entertained a parent's appeal and reviewed an order of restitution lodged against the mother, even though it was the juvenile, and not the mother, who filed an exception to the master's report. *Id.* at 757, 519 A.2d 806.

The Court's recent decision in *In the Matter of Tyrek S.,* *supra,* 351 Md. 698, 720 A.2d 306(1998), does not persuade us that Ms. A. waived her claim by failing to file exceptions. *Tyrek S.* is factually distinguishable from the case *sub judice.*

In *Tyrek S.,* the juvenile was found to have committed the offense of unauthorized use. At the restitution hearing, the juvenile argued to the master that he lacked the present ability to pay, but the master considered the juvenile's "potential ability." *Tyrek S.,* at 707, 720 A.2d 306. The master concluded that even though Tyrek was young, unemployed, and committed to the Department of Juvenile Justice, this "does not mean that [he] will not have the ability to become employed and earn money and pay the restitution that he owes." *Tyrek S.,* at 707, 720 A.2d 306. The master thus recommended that the juvenile pay restitution to several victims.

Thereafter, counsel for the juvenile noted exceptions on two grounds; one pertained to the juvenile's inability to pay restitution. At the exceptions hearing, however, counsel for the juvenile affirmatively advised the court that "the only issue ... in the case for review" concerned the juvenile's contention that restitution could not be awarded to a victim who was not named in the petition. Thus, the judge never considered the inability to pay issue.

On appeal to this Court, Tyrek claimed that the lower court erred in finding an ability to pay restitution. Because that

issue was not raised at the exceptions hearing, we concluded that the issue was not preserved. *In re Tyrek S.*, 118 Md. App. 270, 277, 702 A.2d 466 (1997). The Court agreed. *In the Matter of Tyrek S.*, at 708, 720 A.2d 306. Moreover, the Court of Appeals declined to exercise its discretion to excuse the waiver. *Id.*, at 709, 720 A.2d 306.

It is significant that, in *Tyrek S.*, counsel for the juvenile essentially waived the inability to pay issue at the exceptions hearing. Moreover, because the restitution dispute concerned the juvenile's "present versus potential ability to pay," *Tyrek S.*, at 707, 720 A.2d 306, it involved disputed factual contentions concerning such matters as the juvenile's anticipated release to the community, his future employability, and his ability to earn money. Under these circumstances, counsel's statement to the court at the outset of the hearing, and the court's resulting failure to consider the issue, certainly constituted a waiver under Md. Rule 8–131(a).

The issue as to Ms. A.'s restitution, however, did not involve any controverted facts. Rather, Ms. A. focuses on the judge's discretionary determination in regard to the uncontested factual evidence adduced at the master's hearing. She "assigns error *to the trial judge* in the exercise of his independent judgment as to the propriety of his disposition of the case from those facts" elicited at the master's hearing. *Miller*, 113 Md.App. at 393, 688 A.2d 45. (Emphasis added).

Additionally, in contrast to *Tyrek S.*, Ms. A.'s failure to lodge exceptions does not offend Md. Rule 8–131(a). That rule guards against a party's assertion of an issue on appeal that was not raised or *considered* below. The "primary purpose" of Rule 8–131(a) is " ' "to ensure fairness for all parties in a case and to promote the orderly administration of law." ' " *State v. Bell*, 334 Md. 178, 189, 638 A.2d 107 (1994) (citations omitted); *see Davis v. DiPino*, 337 Md. 642, 647–48, 655 A.2d 401 (1995). To that end, Maryland Rule 8–131(a) provides that "ordinarily" we will not decide any issue that

does not "plainly appear[ ] by the record to have been raised in *or decided by* the trial court." (Emphasis added).

Here, although the circuit court did not believe that Ms. A. had lodged exceptions, it nonetheless proceeded to consider the issue of restitution as to the mother, "just in case." As a result of the court's commendable desire to be thorough, the question of restitution by Ms. A. was squarely considered and "plainly decided" by the circuit court.

■ Accordingly, we conclude that Ms. A.'s claim is preserved under Rule 8–131(a). Therefore, we may review the judge's final order as to Ms. A., even though she did not file exceptions.

■ We acknowledge that the failure to file exceptions may have serious consequences. Ordinarily, challenges to a master's report that are not raised by exceptions are waived. *See Tyrek S.,* at 708, 720 A.2d 306; *Miller,* 113 Md.App. at 393, 688 A.2d 45. Indeed, *Tyrek S.* suggests that even when an exception is noted in writing, waiver may result if that exception is abandoned at the exceptions hearing. *Tyrek S.,* at 703, 708, 720 A.2d 306. What we said in *Miller* is pertinent here: "[I]n all cases lacking timely exceptions, any claim that the master's findings of fact were clearly erroneous is waived." *Id.* at 393, 688 A.2d 45. In other words, if no exceptions are filed, the parties and the court must accept the master's first-level findings of fact. The mother's failure in *Miller* to file exceptions "would have proven fatal" had she sought to challenge the master's factual findings. *Id.* In this case, as in *Miller,* the underlying factual evidence has not been challenged; the facts regarding the mother's economic circumstances are undisputed.

■ Furthermore, in the context of this case, we do not attach significance to the failure of the notice of appeal to identify the particular parties bringing the appeal. In *In re Jason W.,* 94 Md.App. 731, 619 A.2d 163 (1993), the notice of appeal only mentioned the child, but we considered the mother as an appellant, because we understood "from the brief and

from counsel's assertion at oral argument that the appeal [was] on behalf of both [the child] and his mother." *Id.* at 732 n. 1, 619 A.2d 163. When we couple the text of the notice of appeal, which challenges "the judgment regarding restitution," with the court's entry of a judgment of restitution *against Ms. A.*, we are readily satisfied that the appeal was lodged by both Levon and his mother.

Finally, even if the mother's claims were not preserved, we would exercise the discretion conferred on us by Md. Rule 8–131(a) and consider Ms. A.'s contentions. *See, e.g., State v. Bell*, 334 Md. 178, 638 A.2d 107 (1994); *Taub v. State*, 296 Md. 439, 463 A.2d 819 (1983). In *In Re Don Mc.*, 344 Md. 194, 686 A.2d 269 (1996), the Court concluded that the propriety of the juvenile court's order of restitution was not preserved, because it was not raised below. In its discretion, however, the Court determined to consider the matter and then found that the juvenile court had abused its discretion in ordering the minor and his mother to pay restitution. *Id.* at 200, 686 A.2d 269.[10]

## II.

Appellants contend that the trial court's award of restitution was improper for three reasons. First, they argue that the delinquent act of unauthorized use did not cause the damage for which restitution was ordered. Second, they complain that the court erred by valuing the personal items in the Jeep

---

**10.** In reaching our conclusion with respect to preservation, we are not persuaded by the argument raised by appellants for the first time in their reply brief. There, they argue that Ms. A.'s claim is preserved under *Walczak v. State*, 302 Md. 422, 488 A.2d 949 (1985). In *Walczak*, the Court said that "when the trial court has allegedly imposed a sentence not permitted by law, the issue should ordinarily be reviewed on direct appeal even if no objection was made in the trial court." *Id.* at 427, 488 A.2d 949. But in *In re Victor B.*, 336 Md. 85, 646 A.2d 1012 (1994), the Court of Appeals made clear that despite the "penal overtones" implicit in the adjudication of juvenile causes, "juvenile proceedings are not criminal matters...." *Id.* at 92, 646 A.2d 1012. Thus, despite the arguably punitive character of the court's restitution order, we cannot say that Ms. A. was a "defendant" before the juvenile court, or that she received a "sentence", as contemplated in *Walczak*.

according to their replacement value or purchase price, rather than their fair market value. Third, appellants contend that the master did not adequately consider the age and circumstances of either Levon or Ms. A. when ordering restitution. Before analyzing these assertions, we shall briefly review the principles that undergird juvenile restitution.

In October 1996, when Levon committed the offense of unauthorized use, restitution in juvenile causes was governed by Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 808 ("Liability for acts of child").[11] Effective October 1, 1997, the provisions of Art. 27, § 808 were repealed. At that time, the Legislature combined into a single statute what had been separate adult and juvenile restitution provisions. The restitution provisions for adults and juveniles are now combined and codified at Md.Code (1957, 1996 Repl.Vol., 1998 Cum.Supp.), Art. 27, § 807. *See* 1997 Md. Laws Chs. 311, 312 ("Victims' Rights' Act of 1997"); *In the Matter of Tyrek S.*, at 704 n. 4, 720 A.2d 306. Therefore, when the exceptions hearing was held on October 15, 1997, and the court made its determinations as to restitution, the revised statutory provisions had just become effective.

The parties have not addressed in their briefs whether Art. 27, § 807 applied to this case when the court held the exceptions hearing, even though Art. 27, § 808 was in effect when Levon committed the delinquent act of unauthorized use. Nor have the parties suggested that the outcome of this case turns on which version of the statute governs. We observe, however, that appellants and the State repeatedly cite to Art. 27, § 808. Moreover, appellants argue that at the exceptions hearing held on October 15, 1997—two weeks after the new restitution statute went into effect—the court erred by failing to consider Levon's "age and circumstances." Yet Art. 27, § 807, which is the current version of the statute, does not

---

11. Previously, authorization for restitution orders in juvenile causes was found in C.J. § 3–829. Effective October 1, 1996, C.J. § 3–829 was transferred to Md.Code, Art. 27, § 808, without substantive change. 1996 Md. Laws Ch. 585.

contain the "age and circumstances" language that had appeared in Art. 27, § 808.

We also note that, at the exceptions hearing, neither counsel for the State nor counsel for Levon noted the legislative change or raised any issue with respect to which statutory version should govern the court's decision as to restitution. Moreover, because the trial court's order of October 15, 1997, does not refer to either Art. 27, § 807 or Art. 27, § 808, we do not know which version of the statute the court applied.

In our analysis of the court's order of restitution, we shall refer to both Art. 27, § 808, the statute in effect when the offense was committed, and the current statute, which was in effect by the time the exceptions hearing was held. Our comparison of both versions of the statute leads us to conclude that, with respect to the particular issues before us, the outcome of this case does not hinge on the legislative changes regarding restitution. We explain.

Art. 27, § 808, the earlier version of the statute, which applied only to juvenile offenders, provided, in relevant part:

### § 808. Liability for acts of child.

(a) *In general*—(1) The juvenile court may enter a judgment of restitution against the parent of a child, the child, or both in any case in which the court finds a child has committed a delinquent act and *during or as a result of the commission of that delinquent act has:*

(i) Stolen, damaged, destroyed, converted, unlawfully obtained, or substantially decreased the value of the property of another;

\* \* \*

(b) *Restitution to wronged person personally.*—**Considering the age and circumstances of a child,** the juvenile court may order the child to make restitution to the wronged person personally.

\* \* \*

(e) *Judgment against parent.*—A judgment of restitution against a parent may not be entered unless the parent has

been afforded a reasonable opportunity to be heard and to present appropriate evidence in the parent's behalf. . . . (Emphasis added).

The current statutory version, Art. 27, § 807, which applies to both adult and juvenile offenders, provides, in part:

### § 807. Restitution for crimes.

(a) *Restitution upon conviction, acceptance of plea of nolo contendere, etc.; priority of payment; reasons for not ordering restitution.*—(1) A court may issue a judgment of restitution directing a defendant to make restitution in addition to any other penalty for the commission of a crime, if:

(i) Property of the victim was stolen, damaged, destroyed, converted, unlawfully obtained, or its value substantially decreased **as a direct result of the crime;**

\* \* \*

(3)(i) Notwithstanding any other provision of law, if the defendant is a child, the court may order the child, the child's parent, or both to pay restitution to a victim.

\* \* \*

(iii) A court may not enter a judgment of restitution against a parent under this section unless the parent has been afforded a reasonable opportunity to be heard and to present appropriate evidence on the parent's behalf. A hearing under this section may be held as part of the sentencing or disposition hearing.

(4) A court need not issue a judgment of restitution under this section if the court finds:

(i) That the defendant or liable parent **does not have the ability to pay the judgment of restitution;** or

(ii) **Good cause to establish extenuating circumstances as to why a judgment of restitution is inappropriate in a case.**

(Emphasis added).

Prior to 1987, the juvenile restitution statute provided that only property damaged "during" the commission of a delin-

quent act could be the subject of a restitution order. In 1987, the Legislature broadened the causation nexus by allowing restitution for damage caused "during *or as a result of*" a delinquent act. 1987 Md. Laws Ch. 344 (emphasis added). In contrast, the statute now authorizes restitution when property is damaged "as a direct result of the crime." Art. 27, § 807(a)(1)(i).

The case of *In re Jason W.*, 94 Md.App. at 736–37, 619 A.2d 163, interpreting the "during or as a result of" language, established that "three findings (and the evidence to justify them) are required to support a restitution judgment." Specifically, the court said a juvenile court must find:

(1) that the child committed a delinquent act; (2) that the child damaged, destroyed, or decreased the value of another's property; and (3) that such damage, destruction, or diminution in value caused by the child occurred during or as a result of the delinquent act.

Even if the above criteria were satisfied, however, a court could not order restitution under Art. 27, § 808 unless it considered "the age and circumstances" of the child, and provided the parent with an opportunity to be heard and to present evidence. Art. 27, § 808(b); § 808(e); *see In Re Don Mc*, 344 Md. at 202, 686 A.2d 269. The current version of the statute deletes the "age and circumstances" language. Instead, the statute now focuses expressly on the "ability to pay" of the juvenile and the parent. *See* Art. 27, § 807(a)(4)(i). Moreover, the statute now expressly provides that the court "need not issue a judgment of restitution" when "good cause" is shown, establishing "extenuating circumstances as to why a judgment of restitution is inappropriate in a case." Art. 27, § 807(a)(4)(ii).[12] Moreover, the revised statute maintains the right of a parent to be heard and to present evidence. Art. 27, § 807(a)(3)(iii). It also continues the "absolute limit" of $10,-

---

12. Language to this effect previously appeared in the earlier version of Art. 27, § 807, when it applied only to adult restitution. *See* Md.Code, Art. 27 (1996 Repl.Vol.), § 807(b)(3).

000 that may be imposed upon the parent or child for restitution. Compare Art. 27, § 808(c)(2); Art. 27, § 807(a)(3)(ii).

As we see it, the text of Art. 27, § 807(a)(4)(i), which concerns "ability to pay," and the text of Art. 27, § 807(a)(4)(ii), concerning "good cause," codify the case law that has developed over many years. With respect to restitution, our courts have repeatedly stressed the vital importance of the ability to pay, even when that language did not appear in the statute. Further, we have long recognized the broad discretion vested in the judge regarding an order of restitution. In *In Re Don Mc.*, 344 Md. at 201, 686 A.2d 269, for example, the Court said that "Maryland law confers upon a juvenile court broad discretion to order restitution." Similarly, the Court recognized that the minor and the parent must have the ability to comply with an order of restitution. *Id.* at 203, 686 A.2d 269; *see Coles*, 290 Md. at 306, 429 A.2d 1029. Given that "the fundamental objective of promoting rehabilitation" is often "frustrated" when the amount of restitution exceeds the offender's ability to pay, *Coles*, 290 Md. at 306, 429 A.2d 1029, the appellate courts have also made clear that a juvenile court is vested with the discretion to deny a claim for restitution when the circumstances warrant that result. *In Re Don Mc*, 344 Md. at 203, 686 A.2d 269; *In Re Zephrin D.*, 69 Md.App. at 762, 519 A.2d 806.

To be sure, when the above cited cases were decided, the restitution statutes at issue did not contain the "ability to pay" language or the "good cause" language that appears in the present version of the restitution statute. In our view, the current statute now mirrors well-settled case law.

The juvenile restitution statute continues to be both "compensatory" and "penal" in nature, *In re William George T.*, 89 Md.App. 762, 771, 599 A.2d 886 (1992), and thus "serves a dual objective." *In Re Zephrin D.*, 69 Md.App. at 761, 519 A.2d 806. On the one hand, the statute "provides for compensation to victims who have been injured or whose property has been stolen, damaged or destroyed as a result of a minor's wrongful acts." *In re Zephrin D.*, 69 Md.App. at 761, 519

A.2d 806. On the other hand, it permits punishment of parents because of " 'a presumed neglect of parental responsibilities' " *In re Zephrin D.*, 69 Md.App. at 761, 519 A.2d 806 (citation omitted), even though, at common law, a parent was not vicariously liable for the wrongful acts of his or her child. Parental punishment is predicated on the view that, "as between the victim, or the public, and the parents of a delinquent child, the parents should bear the expense caused by their child." *In re William George T.*, 89 Md.App. at 775, 599 A.2d 886.

In addition to the twin goals of compensation and punishment, restitution remains an integral part of the process of juvenile rehabilitation. The Court has previously observed that restitution can "impress upon [the youngster] the gravity of harm he has inflicted upon another," and "provide an opportunity for him to make amends." *In re Herbert B.*, 303 Md. 419, 427, 494 A.2d 680 (1985). Similarly, the Court recognized in *In re Don Mc.*, 344 Md. at 203, 686 A.2d 269, that the " 'concern that the victim be fully compensated should not overshadow [the court's] primary duty to promote the rehabilitation of the defendant.' " (quoting *Coles v. State*, 290 Md. 296, 306, 429 A.2d 1029 (1981)).

At oral argument, appellant's counsel suggested that State Farm and Andrews would not be able to recover in tort from appellant, because he was merely a passenger in the Jeep and it was the driver who negligently operated the vehicle. Therefore, counsel urged that the victims should not have greater rights to recover damages from appellants in restitution than they would have in a tort suit. We agree that the juvenile restitution statute is not "intended to create a civil cause of action for the victim or to turn the juvenile court into a forum for damage suits." *In Re Jason W.*, 94 Md.App. at 735, 619 A.2d 163; *see In re Zephrin D.*, 69 Md.App. at 762, 519 A.2d 806. Thus, the statute "is not a mirror of principles underlying damages in tort; it limits recovery in amount, substance and source." *In re Zephrin D.*, 69 Md.App. at 764, 519 A.2d 806. Moreover, as we noted, the court has the discretion to deny restitution, regardless of fault. In contrast,

when fault and damages are established in a civil tort proceeding, "[t]here is no ... discretion available to a court ...." with respect to a monetary award. *Id.* at 762, 519 A.2d 806. But in other ways, recovery of restitution from a juvenile or the juvenile's parent is "more expedient ... than would be recovery in a civil suit." *Id.* For example, an order of restitution may be imposed upon a parent, even when such recovery is "not otherwise available under the common law in Maryland." *Id.* at 764, 519 A.2d 806.

 Accordingly, we do not perceive a juvenile's lack of liability in the civil arena as an absolute bar to restitution in regard to a delinquency case. The changes in the restitution provisions as to juveniles have not altered the principles that we have outlined above. Accordingly, as we consider the issues presented here, we shall continue to apply the principles discussed above.

### III.

We turn to consider appellants' claims that the court erred by imposing orders of restitution upon Levon and his mother for a delinquent act that was not the cause of the damages and losses. In particular, because Levon was found not to have stolen the vehicle or to have committed malicious destruction of property, appellants urge that the juvenile court erred in requiring restitution for damages resulting from theft and malicious destruction.

In analyzing appellants' contention as to theft-related damages, *In re Jason W.*, 94 Md.App. 731, 619 A.2d 163, is instructive. There, a juvenile driving an unlicensed motorcycle tried to outrun two police vehicles that were in hot pursuit. 94 Md.App. at 732, 619 A.2d 163. One officer drove an all-terrain vehicle, while the other drove an ordinary police cruiser. *Id.* During the chase, Jason proceeded through various obstacles and traveled down a path into the woods with both police vehicles in chase. Eventually, Jason lost control of the motorcycle and was apprehended by the officer driving the all-terrain vehicle. *Id.* at 733, 619 A.2d 163. Unfortunately, the officer driving the cruiser misjudged the

width of the path leading into the woods and crashed into a tree, injuring himself and extensively damaging the cruiser. *Id.* Thereafter, Jason was charged with operating an unregistered vehicle, eluding an officer, and driving on a suspended license. *Id.* Subsequently, pursuant to a plea bargain, Jason pled "involved" to the charge of operating an unregistered vehicle, and the other two charges were put on the stet docket. *Id.* Jason and his mother were ordered to pay $3,656.00 in restitution for the damage to the police cruiser.

On appeal, we considered whether Jason and his mother could be held liable for damages to the police vehicle. In our view, Jason's conduct did not cause the damage to the cruiser. Rather, the damage to the cruiser resulted from the minor's conduct in fleeing, not from driving an unregistered vehicle. The Court observed: "*That* was the delinquent act which led to the chase into the woods, but, as noted, that charge was not prosecuted and no finding as to it was made." 94 Md.App. at 737, 619 A.2d 163. Therefore, we determined that the restitution judgment was erroneous under C.J. § 3–829. We reasoned that "by proceeding only on the operation of an unregistered vehicle charge and placing the 'eluding an officer' charge on the stet docket, the State destroyed the required nexus between the delinquent act and the damage." 94 Md.App. at 737, 619 A.2d 163. Writing for the Court, Chief Judge Wilner explained:

> The statute does not allow restitution simply because property damage results from a delinquent act. It requires that the child have caused that damage. That did not happen here. Jason's conduct did not damage the sheriff's car; Deputy Guy's conduct did. In order to sustain the judgment, we would have to read the statute as though that last part of it read 'and during or as a result of the commission of that delinquent act the property of another was damaged or destroyed, or its value was substantially decreased.' But that is not what it says.

*In re Jason W.,* 94 Md.App. at 737, 619 A.2d 163.

Appellant argues for a sweeping application of *Jason W.* He contends that it was John, not Levon, who stole the Jeep and

was driving it when it crashed. Moreover, he claims that "[t]here was no finding—and no evidence—that Levon damaged the Jeep."

As we see it, the link between Jason's delinquent act in *In re Jason W.* and the damage to the police cruiser was more attenuated than the causal connection in Levon's case; Levon was a passenger in the very vehicle that was actually damaged. 94 Md.App. at 733, 619 A.2d 163. Moreover, the only delinquent act that Jason was found to have committed was the operation of an unregistered vehicle, and that offense clearly lacked "the required nexus between the delinquent act and the damage." *Id.* at 737, 619 A.2d 163.

Relying on *In re Gloria T.*, 73 Md.App. 28, 532 A.2d 1095, *cert. denied*, 311 Md. 718, 537 A.2d 272 (1988), the State counters that Levon is liable for the full amount of restitution, regardless of his degree of participation. The State urges that Levon was a principal and not an accessory to the crime of unauthorized use.

In resolving Levon's contention at the exception hearing, the juvenile judge explicitly relied on *In re Gloria T.*, stating:

In re Gloria T. stands for the well established principle in this state that in terms of misdemeanors all participants are deemed to be principles [sic] and I have researched that point many times in connection with adult offenders and I'm convinced that that is still good law. So, in the case of unauthorized use, commonly known as a joy ride situation, therefore, occupying a stolen car without the permission and consent of the owner and the car sustains damages, all persons found on or about the car are, in fact, chargeable as principals and all are equally liable.

In *Gloria T.*, the juvenile was adjudicated delinquent due to her participation in the assault and battery of another girl. Gloria's role in that crime consisted of helping her friends lure the victim into an open field "[o]n the pretext of buying the victim a soda...." *Id.* at 31, 532 A.2d 1095. Gloria then "brought her hands up around the victim's neck ... and threw the victim to the ground. [Gloria's] companions then beat the

victim until she bled and her nose and cheekbone were broken." *Id.* Rejecting the notion that a juvenile's act must be the "immediate cause" of damage for which restitution is ordered, this Court held Gloria "liable for the full amount of the restitution judgment regardless of the degree of her participation." *In re Gloria T.*, 73 Md.App. at 32, 532 A.2d 1095. Rather, it was sufficient that the juvenile actively participated in the crime that caused pecuniary damage. The Court reasoned:

> Under the facts of this case, appellant's delinquent act would be characterized as a battery.
>
> In any event, either assault or battery is a misdemeanor and all participants are chargeable as principals. On this basis, appellant is liable for the full amount of the restitution judgment regardless of the degree of her participation. The fact that appellant's participation in the attack was not the immediate cause of the injuries to the victim which required medical attention is irrelevant.

*Id.* at 32, 532 A.2d 1095. (citations omitted).

We do not believe that *Gloria T.* is entirely controlling here. Neither *Gloria T.* nor *Jason W.* authorize an order of restitution for damages that occurred prior to the juvenile's commission of, or participation in, the delinquent act. Indeed, *Jason W.* expressly stated that, by statute, juvenile restitution may be ordered only if the court finds that the "damage, destruction, or diminution in value ... occurred *during or as a result of the delinquent act.*" 94 Md.App. at 736–37, 619 A.2d 163 (emphasis added).

Here, the master found facts not sustained as to Levon's theft of the Jeep. Nevertheless, part of the restitution was predicated on damages that necessarily occurred in connection with the theft. For example, the order of restitution against Ms. A. included damages for the cost of repairing the Jeep's window and ignition, which were obviously damaged during the theft itself. Moreover, both Levon and his mother were obligated to make restitution for certain items of personal property that most likely were damaged or stolen in connec-

tion with the theft, such as "The Club," which Andrews testified was "secured" at the time of the break in. Given the finding that Levon did not commit the theft, we agree with appellants that they cannot be ordered to pay restitution for damages directly resulting from the theft. Because neither the master nor the court distinguished between damages caused by the initial theft, for which Levon was found not involved, and damages that occurred due to the unauthorized use, the court erred.

That conclusion does not end our inquiry, however. Relying on *Gloria T.* and other cases, we reject appellants' contention that the court also erred in imposing restitution with regard to the damages that occurred during the period of the unauthorized use. Given Levon's commission of the offense of unauthorized use, it is of no moment that he was only a passenger at the time of the accident that caused damage to the vehicle; the accident occurred during the period of unauthorized use. In view of that unassailable fact, we agree with the State that Levon's delinquent act provided a sufficient basis on which to award restitution for the losses and damages that occurred during or as a result of the unauthorized use. We explain further.

The offense of unauthorized use, codified at Art. 27, § 349, has been described as a " 'junior varsity' version of larceny law." *In re Lakeysha P.*, 106 Md.App. 401, 410, 665 A.2d 264 (1995). The crime has four elements: "1) an unlawful taking; 2) an unlawful carrying away; 3) of certain designated personal property; 4) of another." *Id.* at 411, 665 A.2d 264. The offense applies to "any person or persons," as well as to "his or their aiders or abettors," who "take and carry away out of the custody or use of any person or persons . . . any of the above, enumerated property [here, a motor vehicle] . . . ." Art. 27, § 349. The statute also requires the offender to "restore the property so taken and carried away," or, if unable to do so, to "pay to the owner or owners the full value thereof. . . ."

In *Anello v. State,* 201 Md. 164, 168, 93 A.2d 71 (1952), the Court held that "[t]o be an aider or abettor [under § 349] it is not essential that there be a prearranged concert of action, although, in the absence of such action, it is essential that [a person] should in some way advocate or encourage the commission of the crime." The Court also said: "[G]uilty knowledge is essential to a conviction," but "such knowledge may be inferred from facts and circumstances such as would cause a reasonable man of ordinary intelligence, observation and caution to believe that the property has been unlawfully taken." *Id.*

In Maryland, evidence that a person was a willing passenger in a car that he or she knew was stolen is sufficient evidence of criminal intent to sustain a conviction for unauthorized use. In *Anello,* the Court held that a passenger of a stolen vehicle was guilty of unauthorized use, despite his claim that he innocently accepted a ride from a man he hardly knew; circumstantial evidence supported the conclusion that the defendant knew the car was stolen when he got into the vehicle. 201 Md. at 169, 93 A.2d 71.

Similarly, in *Banks v. State,* 2 Md.App. 373, 234 A.2d 798 (1967), we upheld a conviction for unauthorized use even though the defendant had not been involved in the actual theft of the vehicle. In that case, the defendant testified that a friend and an "inebriated sailor" picked him up in Cecil County, in a car that the friend said belonged to an unnamed acquaintance. After dropping off the sailor, the two men drove to Pennsylvania, where the defendant took over driving the vehicle. Both men were arrested in Pennsylvania. At the time of the arrest, the ignition switch was "punched out and the wires [were] dangling." *Id.* at 375, 234 A.2d 798. We held that the evidence was sufficient to establish that "[the defendant] had unlawfully taken and carried away 'out of the custody and use' of the owner ... [the owner's] car for his 'present use,' in violation of the code." *Id.* at 376, 234 A.2d 798. We said:

The jury's finding clearly reveals that it did not believe the defense presented and found that the appellant was not free from guilt. *'One is guilty [of unauthorized use] under section 349, if he participates in the continued use of the stolen car after the original taking, since this manifests the intent to deprive the owner of his possession.'*
*Id.* at 376–77, 234 A.2d 798 (quoting *Spence v. State,* 224 Md. 17, 19, 165 A.2d 917 (1960)) (emphasis added).

Most recently, in the case of *In the Matter of Tyrek S., supra,* the Court upheld a restitution order imposed upon a juvenile who was found delinquent with respect to the unauthorized use of a Volvo that had been stolen and was involved in a car accident. According to the facts found by the master at the adjudicatory hearing, Tyrek was a passenger in the vehicle at the time of the collision. We note, however, that no issue was raised as to the significance of the juvenile's status as a mere passenger when the accident occurred. *In the Matter of Tyrek S.,* at 699, 702, 720 A.2d 306.

 Because an aider and abettor is, under Art. 27, § 349, "equally guilty with the principal perpetrator of the crime," *Anello,* 201 Md. at 168, 93 A.2d 71, he or she is equally liable for the full range of penalties proscribed by the statute. As we noted, by statute, this includes the provision that the guilty party either "restore the property so taken" or pay the owner the "full value." Art. 27, § 349. Relying on *Banks* and *Anello,* we conclude that an offender, such as Levon, who "participates in the continued use of [a] stolen car after the original taking" may be found to have committed the offense of unauthorized use, and thus may be ordered to "restore the property so taken." *Banks,* 2 Md.App. at 376–77, 234 A.2d 798; Art. 27, § 349. On this basis, the juvenile court lawfully awarded restitution for those damages caused during or as a result of the unauthorized use.

Other states have also held that a juvenile's involvement in the unauthorized use of a vehicle is sufficient to sustain restitution for damages caused during the course of that use, even when the child did not participate in the actual theft of

the vehicle. In *People v. Rivera*, 135 Misc.2d 350, 515 N.Y.S.2d 397 (Dist.Ct.1987), for example, a seventeen year old passenger in a stolen car pled guilty to unauthorized use of the vehicle, but appealed a restitution award of $2,566.00 for damages incurred when the car collided with another vehicle after a high speed chase. Although the defendant admitted that he knew the car was stolen, he contended that restitution was unwarranted because he was not the driver of the car when it crashed. In fact, the evidence showed that the defendant "yelled to [the driver] to stop the vehicle, which at the time was speeding at 80 mph." *Id.* 515 N.Y.S.2d at 397. The New York court disagreed, holding that the defendant "aided [the driver] in the unauthorized use of a motor vehicle." *Id.* 515 N.Y.S.2d at 398. Similarly, in *State v. Massey*, 106 Or.App. 242, 806 P.2d 193 (Or.Ct.App.1991), *rev. denied*, 311 Or. 643, 815 P.2d 1273 (Or.1991), the Court of Appeals of Oregon sustained an award of restitution based on an underlying charge of unauthorized use. There, the defendant was arrested driving a car that he knew had been stolen some two weeks before his arrest. Because the owners of the car "suffered pecuniary damages as a result of [the] defendant's criminal activities——his continued illegal possession of the car," the court held that restitution was proper. *Id.* at 194.

In contrast to our conclusion with respect to the theft-related damages, we perceive no error in the court's restitution order as to malicious destruction. Although the court found that Levon did not commit the crime of malicious destruction of property, the evidence supported the conclusion that property was damaged or lost in the course of the unauthorized use, even if Levon did not do so with the intent that is required to sustain the offense of malicious destruction of property. *See In re Albert S.*, 106 Md.App. 376, 399, 664 A.2d 476 (1995) (stating that "it is not sufficient [for malicious destruction of property] that the defendant merely intended to do the act which led to the damage; it is necessary that the defendant *actually intended* to damage the property in question."); *see also In re Taka C.*, 331 Md. 80, 83–84, 626 A.2d 366 (1993); *Shell v. State*, 307 Md. 46, 65–68, 512 A.2d 358

(1986)(malicious destruction of property "requires both a deliberate intention to injure the property of another and malice").

In sum, we conclude that the court erred to the extent that it awarded restitution for damages sustained in connection with the theft of the Jeep, for which Levon was found not culpable. Because the court did not differentiate between damages resulting from the initial theft and those that occurred during or as a result of the unauthorized use, we shall vacate the award of restitution and remand for further proceedings. On remand, the juvenile court must exclude from an order of restitution any damages that relate solely to the theft.

## IV.

Appellants complain that the court erred by valuing Mr. Andrews's personal items according to their replacement cost or original purchase price rather than their fair market value, as required by Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 808(c)(i), (ii). In our view, this issue is not preserved. Levon's notice of exception contained only two complaints: 1) the State "failed to prove that the delinquent act was the cause of the car owner's damage or loss;" and 2) the master "failed to take into consideration the age and circumstances of the Respondent when ordering restitution." Nor did defense counsel raise the issue during the exception hearing. *See* Md. Rule 8–131(a).

Even if preserved, we see no merit to this complaint. "Fair market value" is well defined in Maryland law, but is often difficult to ascertain in a particular case. "Fair market value" is " 'the price which a purchaser willing, but not compelled, to buy would pay, and which an owner willing, but not compelled, to sell would accept, for the property.' " *In re Christopher R.*, 348 Md. 408, 412, 704 A.2d 443 (1998) ( quoting *Marchant v. Mayor and City Council of Baltimore*, 146 Md. 513, 527–28, 126 A. 884 (1924)); *see also In re Trevor A.*, 55 Md.App. 491, 501, 462 A.2d 1245 (1983); *State Roads Commis-*

*sion v. Warriner,* 211 Md. 480, 485, 128 A.2d 248 (1957); *Lewis v. Beale,* 162 Md. 18, 23, 158 A. 354 (1932). We do not perceive clear error in deducing the fair market value from the evidence presented. *In re Timothy F.,* 343 Md. 371, 379–80, 681 A.2d 501 (1996) ("When the trier of fact is the trial court, its judgment on the evidence will be set aside only if it is clearly erroneous."); *In re Trevor A.,* 55 Md.App. at 501, 462 A.2d 1245.

Appellants compare Levon's case to *In re Christopher R., supra,* 348 Md. 408, 704 A.2d 443. In that case, a fifteen year old boy broke into an elementary school and stole a 1994 Apple computer and various other pieces of computer equipment. The court found the boy delinquent and ordered him to pay $5,000.00 restitution, the statutory maximum at the time. The school originally paid $5,049.00 for the equipment, and estimated the replacement cost at $5,415.00. The master recommended restitution based on the replacement cost. The trial judge admitted he had "absolutely no way to know what [the] rate of depreciation should be for computers," so he based his award on what the school paid for the equipment. *Id.* at 410, 704 A.2d 443. The Court of Appeals reversed. In its estimation, because "advances [in computer technology] are constantly being made so that used equipment depreciates in value over relatively short periods of time," neither the replacement cost nor the price originally paid reflected the "fair market value" of the stolen goods. *Id.* at 412–13, 704 A.2d 443.

*Christopher R.* is readily distinguishable from this case, however. Mugs, blankets, and cassette tapes do not ordinarily plummet in value over the course of a few months, as computers do. Moreover, it is well settled that proof of market value "may be indirect as well as direct." *Wallace v. State,* 63 Md.App. 399, 410, 492 A.2d 970 (*quoting Vucci v. State,* 13 Md.App. 694, 701, 284 A.2d 646 (1971)), *cert. denied,* 304 Md. 301, 498 A.2d 1186 (1985).

Furthermore, "on appeal, the burden of establishing error in the lower court rests squarely on the appellant."

*Bradley v. Hazard Technology Co.,* 340 Md. 202, 206, 665 A.2d 1050 (1995); *see also Thomas v. City of Annapolis,* 113 Md.App. 440, 450, 688 A.2d 448 (1997); *Myers v. Estate of Alessi,* 80 Md.App. 124, 140, 560 A.2d 59, *cert. denied,* 317 Md. 640, 566 A.2d 101 (1989). In this case, appellants have offered no reason why replacement cost is not an accurate indicator of the fair market value of the victim's personal items. *See In re Trevor A., supra,* 55 Md.App. 491, 462 A.2d 1245.

## V.

Appellants contend that the court "did not adequately consider Levon's age or circumstances, including the ability of Levon or his mother to pay, before ordering . . . restitution of more than two thousand dollars." (Emphasis added). Appellants concede that the master "afforded Levon and his mother the opportunity to be heard and to present evidence. . . ." Based on the amounts of the restitutionary awards, however, they complain that both the master and the court did not "adequately consider" the evidence. In essence, appellants argue that because they lack the ability to pay, the court abused its discretion in ordering restitution.

As we observed earlier, we review the juvenile court's order for abuse of discretion. In *In re Don Mc.,* 344 Md. at 201, 686 A.2d 269, the Court explained:

Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. Where the decision or order of the trial court is a matter of discretion it will not be disturbed on review except on a clear showing of abuse of discretion, that is, discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.

(quoting *State ex. rel. Carroll v. Junker,* 79 Wash.2d 12, 482 P.2d 775, 784 (Wash.1971)).

Again, *In re Don Mc., supra,* 344 Md. 194, 686 A.2d 269, is noteworthy. In that case, a fifteen year old boy stole an

automobile and subsequently totaled it in an accident. The owner's insurance company paid the victim $8,366.25, representing the fair market value of the car, less the victim's deductible. When awarding restitution, the master spent no time evaluating whether the juvenile or his mother could pay. He simply asked the victim's insurance agent how much the company paid, and assessed the juvenile and his mother the maximum amount allowed under statute. 344 Md. at 199–200, 686 A.2d 269. The Court of Appeals reversed. In its estimation, the juvenile court abused its discretion because it did not consider the age or circumstances of the child, or the ability of the child or parent to pay. *Id.* at 203, 686 A.2d 269. Instead, the court "predetermined that the appropriate award was the statutory maximum, and he arrived at this conclusion without any consideration of the age and circumstances of this child." *Id.*

 With *In Re Don Mc.* in mind, we see no merit to appellants' complaint as to Levon's restitution. The record reflects that both the master and the court carefully considered Levon's age and circumstances. Indeed, the court imposed liability for only a relatively small portion of the total damages, and gave Levon a reasonable time to pay. At the same time, both the master and the court recognized that Levon would soon be old enough to get a job, and that he should do so. Further, at the exceptions hearing, the judge clearly applied his independent reasoning to the master's factual findings. In upholding the master's recommendation, he said:

I believe—and it is not I'm a self made person, and if it was good enough for me, it should be good enough for them—but I'm sincerely of the belief if one is involved in joy riding in a stolen car, the car sustains damages, that he respondent, as part of rehabilitation, as part of probation, ought to be required to pay restitution.

I'm satisfied in his decision and also based on the restitution hearing that Master Sampson did, in fact, consider the age and circumstance of the respondent. I'm not satisfied that his ruling was erroneous and, therefore, as to the

master's order, that the respondent pay restitution of 443.73 over a period of 18 months to the—I also want to point out that he ordered that to be paid jointly and severally with the co-respondents, that is, the decision and recommendation was an appropriate one and, therefore, the exception with respect to restitution against the respondent is also overruled.

 As to Ms. A., however, we reach a different result. "[R]ecovery [in a restitution hearing is] intended to follow the ability to pay." *In re Jose S.*, 304 Md. 396, 401, 499 A.2d 936 (1985)(quoting *In re Appeal No. 321*, 24 Md.App. 82, 85, 329 A.2d 113 (1974)). Because an order of restitution should not exceed the ability to pay, *Coles*, 290 Md. at 306, 429 A.2d 1029, the lower court must conduct a " 'reasoned inquiry' " into a person's ability to comply with an order of restitution. *In re Don Mc.*, 344 Md. at 203, 686 A.2d 269 (quoting *Coles*, 290 Md. at 306, 429 A.2d 1029).

To be sure, unlike *In re Don Mc.*, the master here entertained detailed testimony about Ms. A.'s financial situation, including evidence about her income, housing arrangements, dependents, and monthly expenses. In that sense, Ms. A. was not denied a "meaningful opportunity to present appropriate evidence on her behalf." *In re Don Mc.*, 344 Md. at 203–04, 686 A.2d 269. Nevertheless, the inquiry clearly demonstrated that Ms. A. had no ability to pay the kind of restitutionary award imposed here. Indeed, the master recognized Ms. A's dire economic situation, and conceded that he had "to decide how much food [he's] going to take out of her children's mouths." When pressed by Levon's attorney to explain how Ms. A. could possibly pay such a substantial amount of restitution against her, the master said: "[Levon] is in court because of the actions of his mother and father. His father is not here. I can't do anything with his father, and I think the mother should go up here and try to get this money from this man, who decided to dump her and these children like a piece of garbage." [13]

---

13. Restitution could not have been assessed against Levon's father unless he had been "afforded a reasonable opportunity to be heard and

Thereafter, at the exceptions hearing, when the court considered the restitution order as to the mother, it recounted the uncontradicted evidence presented to the master. Our difficulty concerns the court's failure to apply its independent judgment to the uncontested facts regarding the mother's economic plight. Instead, the court summarily adopted the master's recommendation as to restitution, without setting forth any rationale or reason for doing so; it did not reconcile the master's recommendation with the evidence adduced at the hearing as to the mother's ability to pay. The court said, in part:

> There was quite a bit of testimony taken and afterwards, [the master] ruled that the mother should, in fact, because she was in custody of the respondent at the time of this incident, should be ordered to pay 1 thousand 690 dollars and 17 cents. Court [sic] concurs with that recommendation.

In *In re: Michael G., supra*, 107 Md.App. at 264, 667 A.2d 956, we recognized that the juvenile master's recommendations are not final orders of the circuit court. Writing for the Court, Judge Davis said: "It is the chancellor's role, and not the master's, to determine the ultimate rights of the parties." *Id.* This requires the chancellor to "exercise his or her independent judgment in ruling on the party's exceptions...." *Id.*

---

to present evidence in [his own] behalf." *See* former Art. 27, § 808(e); *see also* current Art. 27, § 807(a)(3)(iii). Ironically, the mother, an impoverished, single parent who came to court as directed, was effectively punished for trying to act responsibly, while the proverbial "deadbeat" parent continued to escape any obligation. Had the father been present, the master or the court might have divided the financial responsibility. If the master felt that both of Levon's parents should both bear financial responsibility for their son's conduct, he might have considered an order of court directing service of process on the father to compel his attendance at the restitution hearing. Regardless, the admonition to Ms. A. to recover the money from Levon's disinterested father, who apparently has never supported Levon, was unfair to Ms. A., her children, and ultimately to the victims.

■ Accordingly, under the circumstances attendant here, we conclude that the court abused its discretion in imposing restitution on Ms. A. for *all* of the victims' losses and damages. Clearly, Ms. A. had no ability to comply with this particular restitution order, unless she sacrificed the well being of her children. We do not believe this is what the statute envisioned. Therefore, on remand, the court should consider an order of restitution commensurate with Ms. A.'s ability to pay.

**APPELLEE'S "MOTION TO STRIKE APPENDIX TO APPELLANT'S REPLY BRIEF" DENIED; RESTITUTION ORDER AS TO APPELLANTS VACATED; JUDGMENT OTHERWISE AFFIRMED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.**