599 A.2d 886

In re WILLIAM GEORGE T.

No. 347, Sept. Term, 1991.

Court of Special Appeals of Maryland.

Jan. 2, 1992.

Emanuel Demedis and John L. Erly (Laurence W.B. Cumberland, on the brief), Prince Frederick, for appellants.

Mary Ann Ince, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Warren F. Sengstack, State's Atty. for Calvert County, Prince Frederick, on the brief), for appellee.

Argued before BISHOP, BLOOM and MOTZ, JJ.

BISHOP, Judge.

Appellants John T., father of juvenile William George T., and William George T. appeal from a judgment of restitution in favor of Calvert Memorial Hospital entered against the appellants by the Circuit Court for Calvert County (Rymer, J.), sitting as a juvenile court.

## FACTS

On April 30, 1990, William George T. ("William"), a juvenile, was transported to the emergency room of Calvert Memorial Hospital after he overdosed on prescription medication. William was admitted to the hospital where he remained in intensive care for a couple of days. Two weeks after his admission, while still a patient at Calvert Memorial, William and one other juvenile, his roommate, did extensive damage to their hospital room and surrounding areas.

According to Joan Emily Adams, a Staff Nurse at the hospital, she was in a meeting in the room next to the juveniles' when she heard a loud bang. The staff was unable to gain entrance to the juveniles' room and the police were called. The loud noise and banging continued. Before the staff could enter the room, two or three inches of water emanating from the room had run into the hallway. Upon entering the room, the staff discovered that the showerhead and the pipe to the commode had been ripped off the wall in the bathroom. The partition wall had holes in it. A large picture window of safety glass was entirely cracked. The juveniles exited the room and proceeded to tear down a fire door. In addition, a computer suffered extensive damage as a result of water coming down through the ceiling. A bedpan washer, various plumbing fixtures, a shower rod, drywall, and certain medical books were also destroyed. A representative of the hospital estimated the total damage, including labor and clean up costs, in excess of $5,000.

William was charged with and subsequently entered a plea of involved in malicious destruction of property having

a value greater than $300.00. A separate restitution hearing was held, and, at its conclusion, the court ordered a judgment of restitution in the amount of $4,000 be entered against William and his father, John T. At the restitution hearing, counsel for the father argued that it was inappropriate for the court to enter judgment against the parents of a juvenile when the juvenile is "not in their care and custody."

## ISSUES

Both appellants raise the following issue:

I. Whether there was sufficient evidence from which the circuit court could determine the fair market value of the property damaged or destroyed?

In addition, the father asks:

II. Whether the circuit court properly entered a judgment of restitution against the father for property damage caused by his minor son in a case in which the juvenile was hospitalized when he committed the delinquent act?

For convenience, we address the issue of parental liability first.

## DISCUSSION

### *Parental Liability*

■ Following a restitution hearing, the Circuit Court for Calvert County (Rymer, J.) entered a judgment against William's father. A judgment of restitution was also entered against William, who appealed only the issue of the amount of the judgment which we address *infra*. The judgment was entered pursuant to Md.Cts. & Jud.Proc.Code Ann. § 3–829 (Supp.1991), which provides in pertinent part:

(a) *In general.*—(1) The court may enter a judgment of restitution against the parent of a child, the child, or both in any case in which the court finds a child has committed a delinquent act and during or as a result of the commission of that delinquent act has:

(i) Stolen, damaged, destroyed, converted, unlawfully obtained, or substantially decreased the value of the property of another;

*   *   *   *   *   *

(2) The court may order the parent of a child, a child, or both to make restitution to:

(i) The victim;

(ii) Any government entity;  or

(iii) A third party payor, including an insurer, that has made payment to the victim to compensate the victim for a property loss under paragraph (1)(ii) of this subsection.

We observe that, on its face, this statute appears to impose absolute liability, up to $5,000, on parents for the delinquent acts of their minor children.  The statutory language requires nothing more than that damage be caused by a child's delinquent act and that a parental relationship exist in order to impose liability on the minor's parents.

William's father argues the trial court's entry of a judgment of restitution against him is "inconsistent with [the] clear intent of the statute, fundamentally unfair, and unconstitutional," under circumstances where William was a patient in the hospital at the time of his delinquent acts. "Where a father and mother do not have actual custody and control over the child at the time of the act in question," William's father argues, "the court is prohibited from entering a judgment of restitution against them under Section 3–829."  As authority for his assertion, William's father relies on *In re James D.*, 295 Md. 314, 455 A.2d 966 (1983).  A careful analysis of this case is indispensable to our discussion.

*James D.* involved a juvenile who broke into and set fire to a model home, completely destroying it.  At the time of the incident, the juvenile was under commitment to the Juvenile Services Administration and the Montgomery County Board of Education for placement at a particular school, but he escaped from the facility where he was being held.  He had no contact with his father and mother from

the time of his escape until his arrest for this act. When his father and mother were ordered to make restitution in the amount of $5,000, they appealed, and the Court of Appeals granted certiorari prior to argument in this Court. After discussing parental liability statutes from Georgia, Texas, North Carolina, Wyoming, Connecticut, Ohio, Illinois, New Jersey, and Hawaii, and noting that only in Georgia had a statute placing liability on parents been struck down as unconstitutional, the Court observed that each court that had upheld statutes similar to Maryland's had determined the statute was a valid exercise of the police power, applying the rational basis test. The Court then said:

> Whatever may be the theory generally, in the context of this case the father and mother cannot be expected to have prevented the depredations which took place when their son not only was not residing at their home but had been removed from the home by action of the State and lodged with a State agency. Their liability is based only upon being parents.

295 Md. at 326, 455 A.2d 966. Continuing, the Court quoted with approval the following language from a Massachusetts case:

> "When the only justification for a legal burden, penalty, or classification is to punish or deter conduct, the burden cannot fairly be imposed on individuals who have no means of avoiding it. If punishment or deterrence is directed toward individuals who cannot affect the offending conduct, it is illogical. If it is directed toward the wrongdoer, whom the government hopes to reach through its action toward those close to him, it may be logical and effective, but it may also be contrary to basic justice."

295 Md. at 326, 455 A.2d 966 (citations omitted) (quoting *Spence v. Gormley*, 387 Mass. 258, 439 N.E.2d 741 (1982). Finally, the Court stated:

> Problems of constitutionality would arise under the Fourteenth Amendment to the Constitution of the United

States and Maryland Declaration of Rights Art. 24 were we to interpret the statute here as applying to a father or a mother who did not have *actual custody and control* over a child at the time of the act in question.

295 Md. at 327, 455 A.2d 966 (emphasis added). Because William's father had neither physical custody nor control over William at the time of the incident, *James D.* may appear at first glance to imply we should hold that William's father is not liable for William's acts under these circumstances. The holding in *James D.*, however, narrows the seemingly broad exception to parental liability that would be created if "actual custody and control" were a prerequisite to liability. As a result, we hold that William's father is liable for William's delinquent acts. We will explain.

In *James D.* the Court of Appeals held only that "the General Assembly when it enacted this law could not have intended to place liability upon a mother or a father for an act of the child committed while in the custody of the State." 295 Md. at 327–28, 455 A.2d 966. Earlier in its opinion, the Court had stated:

[H]ere we avoid constitutional conflicts by going no further than to hold that our interpretation of "parent" in the statute does not include the father or mother of a child where the child has been removed from their care and custody by court order and is not residing in their home at the time of the incident for which recovery is sought.

295 Md. at 316, 455 A.2d 966. We do not interpret *James D.* to require that a parent must have physical custody and control over their minor child in order for them to be liable for their child's delinquent acts. Such an interpretation would be contrary to the plain meaning of the statute. Moreover, contrary to the father's contention, a broad reading of the exception to parental liability created in *James D.* is not necessary in the case *sub judice* to avert constitutional concerns.

In the only reported decision we were able to find, in which a parental liability statute was declared unconstitutional, *Corley v. Lewless,* 227 Ga. 745, 182 S.E.2d 766 (1971), the statute contained no dollar limit on the extent of parental liability. Georgia has since repealed the former statute and enacted a new one that makes parents or guardians liable in an amount not to exceed $5,000. *See* Ga.Code Ann. § 51–2–3 (Supp.1991). In *Hayward v. Ramick,* 248 Ga. 841, 285 S.E.2d 697 (1982), the court held the new statute constitutional explaining there is a rational relationship between imposing liability on the parents of children who willfully or maliciously damage property and controlling juvenile delinquency.

■ Reported decisions have generally upheld the constitutionality of parental responsibility acts. *See, e.g., Kelly v. Williams,* 346 S.W.2d 434 (Tex.Civ.App.1961); *General Ins. Co. of Am. v. Faulkner,* 259 N.C. 317, 130 S.E.2d 645 (1963); *Mahaney v. Hunter Enter., Inc.,* 426 P.2d 442 (Wyo.1967); *Rudnay v. Corbett,* 53 Ohio App.2d 311, 374 N.E.2d 171 (Ct.App.1977); *Vanthournout v. Burge,* 69 Ill. App.3d 193, 25 Ill.Dec. 685, 387 N.E.2d 341 (1979); *Piscataway Bd. of Educ. v. Caffiero,* 86 N.J. 308, 431 A.2d 799, *appeal dismissed,* 454 U.S. 1025, 102 S.Ct. 560, 70 L.Ed.2d 470 (1981); *Stang v. Waller,* 415 So.2d 123 (Fla.Dist.Ct.App. 1982); *Alber v. Nolle,* 98 N.M. 100, 645 P.2d 456 (Ct.App. 1982); *Bryan v. Kitamura,* 529 F.Supp. 394 (D.Hawaii 1982). In most instances, the rationale of these cases is that parental responsibility statutes are a valid exercise of the police power, applying a rational basis test. For example, in upholding the constitutionality of a statute which imposed liability on parents for injury to school property caused by a minor, a New Jersey court explained:

> The existence of the parent-child relationship provides a rational basis for imposing liability and is a reasonable means to accomplish the purposes of compensation and deterrence.... The Legislature could have reasonably believed that subjecting parents to vicarious liability for their children's willful and malicious acts of vandalism

would encourage parents to exercise their "guiding role" in the upbringing of their children. Through better parental supervision and guidance, the Legislature hoped to deter delinquent conduct. Our concern is not whether that hope has been or will be fulfilled but whether there is a rational basis for it. Though we acknowledge the difficulties of being a parent, we cannot say that there is no rational basis for the statute.

*Piscataway*, 431 A.2d at 805. The purpose of Maryland's parental responsibility statute is both compensatory and penal. *In re Zephrin D.*, 69 Md.App. 755, 761, 519 A.2d 806 (1987). As we stated previously when a constitutional challenge was raised against the precursor to § 3–829, Article 26, § 71A: "The legislative determination here demonstrates a legitimate State interest in a matter affecting the general welfare. The remedy selected for the protection and promotion of that determination has not been shown to be arbitrary, oppressive or unreasonable." *In re Sorrell*, 20 Md.App. 179, 189, 315 A.2d 110 (1974).

The Court of Appeals did not elaborate as to the "[p]roblems of constitutionality [that] would arise" were it to have held the parents in *James D.* liable. *James D.*, 295 Md. at 327, 455 A.2d 966. In alluding to "constitutional problems" we think the Court of Appeals had in mind the narrow factual situation presented in *James D.* in which the State first removed legal custody and the control of the juvenile from his parents by court order and then attempted to hold the parents liable for the child's delinquent acts. Where a parent does not have *legal custody*, as contrasted with physical custody, of a child, we recognize the imposition of liability on the parent for the child's delinquent acts raises "constitutional problems." In the case *sub judice*, however, the father retained legal custody of William even though he was admitted to the hospital. Md.Fam.Law Code Ann. § 5–203 (1984 & Supp.1991); *Taylor v. Taylor*, 306 Md. 290, 296, 508 A.2d 964 (1986) (distinguishing between legal and physical custody). The imposition of liability on the father does not raise constitutional concerns where,

here, unlike in *James D.,* the parent has legal custody of the juvenile. *See Alber v. Nolle,* 98 N.M. 100, 645 P.2d 456 (App.1982) (statute that did not require parents to have "custody and control" of the child for them to be liable held constitutional). Other jurisdictions impose liability based only on legal custody. Statutes in Alaska, Alaska Stat. § 34.50.020 (1990); Iowa, Iowa Code Ann. § 613.16 (West Supp.1991); Oregon, Or.Rev.Stat. § 30.765 (1991); and Wisconsin, Wis.Stat. Ann. § 895.035 (West Supp.1991) for example, specifically state that "legal custody" is the prerequisite to liability.

Having determined there is no constitutional barrier to imposing liability on William's father, we next examine whether the legislature would have, in fact, intended such a result because in construing a statute, we strive to effectuate the intent of the legislature. *Jones v. State,* 311 Md. 398, 405, 535 A.2d 471 (1988). The statute itself is the primary source of legislative intent. *State v. Patrick A.,* 312 Md. 482, 487, 540 A.2d 810 (1988). Although Maryland's statute has no language which restricts parental liability to situations in which parents have "custody *and* control" or "care and custody" of their minor child, or where the minor is "living with" or "resides with" his or her parents, many other states have such restrictions. *See* Ark.Stat.Ann. § 9–25–102 (Supp.1989) (living with the parents); Cal.Civ.Code § 1714.1 (West 1985) (custody and control); Colo.Rev.Stat. § 13–21–107 (1987) (living with parents); Del.Code Ann. tit. 10, § 3922 (Supp.1990) (living with the parents); Fla.Stat.Ann. § 741.24 (Supp.1991) (living with the parents); Ga.Code Ann. § 51–2–3 (Supp.1991) (custody and control); Ill.Rev.Stat. ch. 70, para. 53 (Supp.1991) (resides with parent or legal guardian); Kan.Stat.Ann. § 38–120 (1986) (living with the parents); Ky.Rev.Stat.Ann. § 405.025 (1991) (care and custody); Me.Rev.Stat Ann. tit 19, § 217 (1981) (living with parents or legal guardians); Mich.Comp.Laws.Ann. § 600.2913 (1986) (living with his or her parents or parent); Minn.Stat.Ann. § 540.18 (1988) (living with the parent or guardian); Mo.Ann.Stat. § 537.045

(Supp.1991) (care and custody); Mont.Code Ann § 40–6–237 (1991) (living with the parents); Nev.Rev.Stat. § 41.470 (1986) (custody and control); N.M.Stat.Ann. § 32–1–46 (1978) (custody and control); N.D.Cent.Code § 32–03–39 (1976) (living with a parent); Okla.Stat.Ann. tit. 23, § 10 (West 1987) (living with parents at the time of the act); S.C.Code Ann. § 20–7–340 (Supp.1990) (residing with the parents or the legal guardian); S.D.Codified Laws Ann. § 25–5–15 (1984) (while residing with their parents); Va. Code Ann. § 8.01–44 (Supp.1991) (living with parents); Wash.Rev.Code Ann. § 4.24.190 (1988) (living with the parent or parents); Wyo.Stat.Ann. § 14–2–203 (1988) (living with the parent or parents). Had the Maryland Legislature wanted to limit parental liability by requiring physical custody and/or control of the child it could have done so on one of the many occasions since its enactment when the statute was before the legislature.

Moreover, other courts construing statutes with language more restrictive than Maryland's have imposed liability based only on legal custody, or have imposed liability even when the minor was not living with his or her parents. *See, e.g., Robertson v. Wentz,* 187 Cal.App.3d 1281, 232 Cal. Rptr. 634, 640–42 (1986) (mother could be statutorily liable for son's wilful acts based upon mere legal custody under statute imposing liability on parents having "custody and control" of minor child); *Pizzo v. Graves,* 453 So.2d 592, 594–96 (La.App.), *cert. denied,* 457 So.2d 1181 (La.1984) (mother was liable for minor son's torts under statute imposing liability on parents "for damage occasioned by their minor or unemancipated children, residing with them, or placed by them under the care of other persons" even though son had been living at a residence other than his mother's for two months before the incident).

Another indicator of legislative intent is the legislative history of the statute itself. When deciding *In re John H.,* 293 Md. 295, 443 A.2d 594 (1982), which held that the Board of Education of Baltimore County is a "wronged person" within the meaning of Md.Cts. & Jud.Proc.Code Ann. § 3–

829 (1974, 1980 Repl.Vol.), the Court of Appeals had occasion to examine the legislative history of § 3–829. The Court explained that the concept of parental liability for the acts of one's child came into Maryland law through a statute applicable only to Montgomery County. 293 Md. at 299, 443 A.2d 594. As enacted in 1959 Md.Laws ch. 608, a judge in Montgomery county had "power to require any parent to make restitution for acts of destruction or theft of any property owned by another, caused or committed by the minor child of such parent," with a limitation of $500. In 1965 the legislature enacted Md.Ann.Code art. 26, § 71A (1957, 1966 Repl.Vol.), which granted judges with jurisdiction in any juvenile cause discretion to award a judgment against any parent in favor of a "wronged person" for "acts of wilful or malicious destruction or theft of any property" owned by the wronged person. The liability was not to exceed $500. 1965 Md.Laws ch. 260. Since the parental liability statute was enacted statewide in 1965, the statute has been before the legislature no less than 15 times. The most significant changes to the law include: the increase of the limit on liability from $500 to $1,000 and from $1,000 to $5,000, 1969 Md.Laws ch. 103, 1977 Md.Laws ch. 301; the expansion of the statute to compensate persons injured by the wilful or malicious acts of a minor child for medical expenses, 1971 Md.Laws ch. 235; the codification of the law in the Courts Article, 1973 Md.Laws. 1st Sp.Sess. ch. 2; the addition of the concept of "fair market value" for the determination of damages under the statute and the inclusion of language requiring that a judgment of restitution may not be entered against a parent unless the parent has been afforded a reasonable opportunity to be heard, and to present appropriate evidence in his or her behalf, 1975 Md.Laws ch. 554; and the change in the characterization of the child's acts from the requirement that the acts be "wilful and malicious" to the requirement that they be "delinquent," 1980 Md.Laws ch. 409. The statute was last before the legislature in 1988 when the subsection of the statute dealing with personal injury was amended to pro-

vide that a written statement or bill for medical, dental, hospital, funeral or burial expenses is prima facie evidence of the reasonableness of such charges. 1988 Md.Laws ch. 686.

We observe from these changes that the trend of the legislature is to expand, rather than to curtail, the extent to which parents may be liable for the delinquent acts of their minor child. Our decision is consistent with this trend.

Finally, we recognize that, in general, parental responsibility statutes impose vicarious liability. Prosser has described vicarious liability as follows:

> A is negligent, B is not. "Imputed negligence" means that, by reason of some relation existing between A and B, the negligence of A is to be charged against B, although B has played no part in it, has done nothing whatever to aid or encourage it, or indeed has done all that he possibly can to prevent it.... This is sometimes called imputed negligence. More often it is called vicarious liability....

W. Page Keeton, Dan B. Dobbs, Robert E. Keeton & David G. Owen, *Prosser and Keeton on The Law of Torts* § 69 (5th ed. 1984). Prosser relates a number of "ingenious reasons" for vicarious liability, including that a master "has a more or less fictitious control over the behavior of the servant." *Id.* He concludes, however, that "[n]one of these reasons is so self-sufficient as to carry conviction...." and characterizes the "modern justification for vicarious liability" as "a rule of policy, a deliberate allocation of a risk." *Id.* (footnote omitted). By enacting § 3–829 the legislature has expressed its preference that as between the victim, or the public, and the parents of a delinquent child, the parents should bear the expense caused by their child. *See also,* Michael A. Axel, *Statutory Vicarious Parental Liability: Review and Reform,* 32 Case W.Res. 559, 560 ("The problems inherent in establishing common law liability against parents of minor tortfeasors led to the passage of many state parental responsibility tort statutes.").

Based on the foregoing, we hold that where a parent has legal custody of a minor and that minor commits a delinquent act, the parent of the minor is liable, pursuant to § 3–829, regardless of the fact that the minor was not in the physical custody or under the control of the parent at the time of the minor's delinquent act.

### Damages

█ The father and William contend that the evidence presented to the circuit court was insufficient for it to determine the fair market value of the destroyed property. We do not agree.

Subsection c of § 3–829 limits the liability that may be imposed upon a parent. The relevant portion of the subsection reads:

(c) *Limitations on judgment.*—(1) A judgment rendered under this section may not exceed:

(i) As to property stolen, destroyed, converted, or unlawfully obtained, the lesser of the fair market value of the property or $5,000;

(ii) As to property damaged, or substantially decreased in value, the lesser of the amount of damage or the decrease in value of the property not to exceed the fair market value of the property or $5,000[.]

Md.Cts. & Jud.Proc.Code Ann. § 3–829(c).

"Fair market value" is "the price in cash which property will bring when it is offered for sale by one who desires but is not obligated to sell and is bought by one who desires but is not obligated to buy." *In re Trevor A.,* 55 Md.App. 491, 501, 462 A.2d 1245 (1983), *cert. dismissed,* 299 Md. 428, 474 A.2d 207 (1984). The total cost of the items submitted to the court was $5,314.41, which consisted of the following:

| | | |
|---|---|---:|
| 1. | 5 Sheets "Fire Rock" Drywall | $ 115.00 |
| 2. | 1 Window Wall Replaced | 306.00 |
| 3. | 1 Two Hour Rated Fire Door | 360.00 |
| 4. | 1 Bed Pan Washer & Adapter | 294.41 |
| 5. | Sink Fixtures | 112.00 |
| 6. | 1 Shower Rod | 91.00 |
| 7. | Clean Up/Labor: | |
| |     Housekeeping & Maintenance Staff | 450.00 |
| |     Repair & Labor: | |
| |     Hang & finish drywall | |
| |     Plumbing Repairs | |
| |     Painting of Rooms | |
| |     Replace Ceiling tile throughout | 900.00 |
| 8. | Computer replaced | 2386.00 |
| 9. | Reference Books replaced | 300.00 |
| | TOTAL: | $5314.41 |

This included $2,386.00 for the replacement of a damaged computer with an upgraded computer. The estimate for repairing the damaged computer was $4,299.46. The court did not allow the $2,386 for the replacement computer or the $450 item for clean up and labor. From the record we have concluded that the trial judge made the following computation:

| | |
|---|---:|
| Total claim | $5,314.41 |
| Less: | |
|     Computer  $2386.00 | |
|     Clean up  $ 450.00 | |
| | $2,836.00 |
| Allowance on computer | $1,521.59 |
| Total Judgment | $4,000.00 |

■ Appellants contend that there is no evidence "as to age, condition, life expectancy, depreciation or appreciation of the items damaged." Appellants do concede that there is some evidence as to age—that many of the items were installed in 1984, at the time the fourth and fifth floors of

the hospital were constructed. Although the hospital collected $3,048.40, over its $5,000 deductible from its insurance carrier, the total claim before the court was not $8,048.40 but $5,314.41. It would be most difficult to depreciate the items which the court allowed, except for the computer. Normally, such items as drywall, a window wall, a fire door, a bed pan washer and adapter, sink fixtures, and a shower rod are not replaced in the normal course of the business of the hospital. The same can probably be said for the reference books. Although the purchase price of a replacement item is not always an indication of the fair market value of the destroyed item, we believe in the case *sub judice*, the court did not err. We are aware that fair market value must be determined by the trial court. *In re Trevor A.*, 55 Md.App. 491, 462 A.2d 1245 (1983). We cannot hold, under the circumstances of the case *sub judice*, that the trial court was clearly erroneous. Although the age of the Unisys computer was not available, from the record, we can determine, as the trial court probably did, that the main frame computer was replaced with a personal computer. Although the replacement was an upgrade of the damaged computer, the cost was substantially less than the cost of a computer replacement identical to the one damaged.

We hold that the court's determination of the damages in the amount of $4,000 was, if anything, conservative and certainly not an abuse of discretion. The testimony of Richard Longenboker, Director of Plant Operations of Calvert Memorial Hospital, was more than adequate to support the amount of judgment and to respond to appellants' contentions.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANTS.