741 A.2d 503

**In re JOHN M.**

**No. 1787, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

Dec. 1, 1999.

Mitchell J. Shapiro (Shapiro & Shapiro, on the brief), Bethesda, for appellant.

Diane E. Keller, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Baltimore, and Robert Dean, State's Attorney for Montgomery County, Rockville, on the brief), for appellee.

Argued before HOLLANDER, EYLER and KENNEY, JJ.

KENNEY, Judge.

This appeal arises from a juvenile delinquency proceeding in the District Court of Maryland for Montgomery County, sitting as a Juvenile Court. The juvenile court ordered John M.

and his mother to pay $38,000 restitution for the counseling expenses of two children whom John M. confessed he sexually abused. John M. and his mother, appellants, contend that the court "clearly erred, procedurally and substantively, with regard to the amount and propriety of the restitution ordered in this matter."

### Facts

John M. admits that, on five different days while babysitting for two of his female cousins, he went to their bedrooms and "fondled" both girls, and digitally penetrated the older girl's vagina. John M. was fifteen years old. The younger cousin ("Victim # 1") was four years old and the older girl ("Victim # 2") was six years old at the time of the abuse, which occurred between September 1, 1995, and September 30, 1996. He sometimes committed the abusive acts more than once in the same babysitting session. John M. claimed that neither girl appeared to awaken during the fondling.

The abuse was discovered on an occasion when the older girl found out that John M. was going to be babysitting for them again. She told her parents that she did not want John M. to babysit and described the acts that he did to her in her bed. The younger girl said she could not remember the abuse, but Victim # 2 said she heard her sister screaming after John M. went into Victim # 1's room. When confronted by the police, John M. admitted to abusing both girls.

On April 4, 1997, two juvenile petitions were filed in the District Court for Montgomery County, charging John M. with twenty-one counts of sexual child abuse and third degree sexual offenses. On June 9, 1997, John M. entered a plea of "involved" to counts 1 and 7 (child abuse) and count 5 (third degree sexual offense) of Petition # 39709428 (regarding Victim # 1) and to counts 1, 7, and 10 (child abuse) and counts 5 and 13 (third degree sexual offense) of Petition # 39709429 (regarding Victim # 2). The other counts were dismissed. The court found John M. to be delinquent.

At the conclusion of a subsequent hearing on August 25, 1997, the Juvenile Court ordered that John M. (1) be placed on probation in the custody of his mother,[1] (2) participate in a juvenile sex offenders program, (3) perform community service, and (4) provide restitution, the amount of which was not determined at that time. On October 20, 1997, the court denied John M.'s motion to compel examinations of the victims by a child abuse therapist hired by John M.

On both December 19, 1997 and April 6, 1998, the court heard testimony regarding restitution. On July 23, 1998, the court issued an order directing John M. and his mother to pay $38,300 in restitution. The order stated:

Whereas, the Court having found the Respondent committed delinquent acts which have required [the victims] to seek counseling from a licensed health care provider in the amount of $38,300;

It is therefore, ORDERED, pursuant to Article 27, Section 808 that [John M. and his mother] immediately pay restitution to [the victims' parents] in the amount of $5,795.

It is further ORDERED, pursuant to Article 27, Section 808, that [John M. and his mother] immediately pay restitution in the amount of $585 to the Department of Juvenile Justice for reimbursement of [Victim # 2's] Spring, 1998 counseling expenses.

It is further ORDERED, pursuant to Article 27, Section 808, that [John M. and his mother] immediately pay restitution in the amount of $31,920 to the Department of Juvenile Justice to be held in an interest bearing escrow account for reimbursement of counseling expenses for [the victims].

It is further ORDERED that upon application by [John M. or his mother], any unexpended portion of the escrow account being held by the Department of Juvenile Justice for the benefit of [the victims] may be returned to the applying party. The application referred to in this portion

---

1. John M.'s parents are divorced, and his mother has sole custody.

of the order shall not be considered by this Court until April 20, 2010.

This appeal followed.

## Questions Presented

John M. and his mother present six questions for our review, which we have slightly rephrased:

1. Whether the juvenile court's award of restitution was clearly erroneous and an abuse of the judge's discretion.

2. Whether John M. received proper notice of the claim for restitution.

3. Whether the juvenile court erred in not granting John M.'s Motion for an Independent Medical Examination of the victims to determine the nature and extent of their injury.

4. Whether the juvenile court's refusal to stay execution of enforcement of the judgment against John M. and his mother was clearly erroneous and an abuse of discretion.

5. Whether John M.'s mother received proper notice of the claim for restitution and was given a fair opportunity to defend the claim for restitution.

6. Whether the juvenile court abused its discretion by granting the State's continuance of the first Disposition/Restitution hearing.

We shall consider the second and fifth questions together. We answer the first, second, and fifth questions in the affirmative and the rest of John M.'s questions in the negative. We shall reverse in part and remand the case for further proceedings in accordance with this opinion.

## Motion to Strike

As a preliminary matter, we shall grant appellee's motion to strike John M.'s appendix. Maryland Rule 8–501(b)(2) provides that no record extract shall be filed in an appeal to this Court from juvenile delinquency proceedings.

## Discussion

### Restitution in Juvenile Proceedings

During the time that this case was being heard in the juvenile court, the applicable statutory provision for restitution was Article 27, § 808.[2] Section 808 stated, in pertinent part:

(a) *In general.*—(1) The juvenile court may enter a judgment of restitution against the parent of a child, the child, or both in any case in which the court finds a child has committed a delinquent act and during or as a result of the commission of that delinquent act has:

\* \* \*

(iii) Caused the victim of the delinquent act to incur reasonable counseling expenses from a licensed health care provider, if the delinquent act involved:

\* \* \*

2. Child abuse under § 35C of this article;

---

**2.** For clarity's sake, we detail the evolution of this statute in the context of this case. During the period in which appellant committed his abusive acts, i.e. between September 1, 1995, and September 30, 1996, the statutory provisions for restitution by a juvenile or his parents were codified as Maryland Code (1995 Repl.Vol.), § 3–829 of the Courts and Judicial Proceedings Art. ("C & J"). However, Section 5, ch. 585, Acts 1996, effective October 1, 1996, transferred former C & J § 3–829 to § 808 of Article 27, with no substantive changes. In the juvenile court, the parties and the court referred to § 808 as the operative statute, although they recognized and acknowledged that those provisions were codified as C & J § 3–829 at the time of appellant's delinquent acts.

Section 1, chs. 311 and 312, Acts 1997, effective October 1, 1997, repealed the former § 808 of Article 27 and rewrote Article 27, § 807. Substantive portions of the superseded § 808, including those at issue in this case, were included in the new § 807. *See* § 807(a)(3), (4), and (c). In this opinion, reference is to the former § 808, the statute the juvenile court was applying and the statute the parties cite in this Court. Our references to " § 808", therefore, are not to the current § 808 unless otherwise noted.

* * *

4. Incest, rape, or sexual offense in any degree . . . .

* * *

(c) *Limitations on judgment.*— . . . (2) As an absolute limit against any one child, his parents, or both, a judgment rendered under this section may not exceed $10,000 for all acts arising from a single incident.

Juvenile proceedings have a "special" character; they are civil in nature, rather than being criminal proceedings. *In re Victor B.*, 336 Md. 85, 93, 646 A.2d 1012 (1994). Juvenile Courts have broad discretion to order restitution, either against the juvenile himself, a parent, or both. *In re Don Mc.*, 344 Md. 194, 201, 686 A.2d 269 (1996).

Restitution serves several objectives. It can compensate victims who have been injured or who have suffered property loss as a result of the wrongful acts of a minor, although "a court's concern that the victim be fully compensated should not overshadow its primary duty to promote the rehabilitation of the defendant." *In re Don Mc.*, 344 Md. at 203, 686 A.2d 269 (citation omitted). Restitution "can 'impress upon [the juvenile] the gravity of harm he has inflicted upon another', and 'provide an opportunity for him to make amends.'" *In re Levon A.*, 124 Md.App. 103, 132, 720 A.2d 1232 (1998) (quoting *In re Herbert B.*, 303 Md. 419, 427, 494 A.2d 680 (1985)). The restitution statute "is also penal in nature since liability arises 'as a consequence of a presumed neglect of parental responsibilities.'" *In re Zephrin D.*, 69 Md.App. 755, 761, 519 A.2d 806 (1987) (citation omitted).

Under the common law in Maryland, absent proof of agency, parents are not vicariously liable for the wrongful acts of their minor children. [C & J] Section 3–829 alters this rule by imposing liability on the juvenile's parent(s) where the child committed a delinquent act that caused injury to another. Exclusive of personal injury, the statute provides for some restitution to the victim where the juve-

nile either permanently deprived the victim of the property by stealing it or destroying it, or where the juvenile merely damaged the property. Since the statute is in derogation of the common law, it must be strictly construed.

*Id.* at 759, 519 A.2d 806 (citations omitted). "[I]n permitting a court to assess restitution against a parent, 'the legislature has expressed its preference that as between the victim, or the public, and the parents of a delinquent child, the parents should bear the expense caused by their child.'" *In re Lorne S.,* 123 Md.App. 672, 679, 720 A.2d 920 (1998) (quoting *In re William George T.,* 89 Md.App. 762, 775, 599 A.2d 886 (1992)).

On appeal, the juvenile has the burden of establishing that the restitution awarded by the juvenile court was erroneous. *In re Levon A.,* 124 Md.App. at 142, 720 A.2d 1232. The juvenile court's decision will not be overturned on appeal "'except on a clear showing of abuse of discretion, that is, discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.'" *In re Don Mc.,* 344 Md. at 200–201, 686 A.2d 269 (quoting *State ex rel. Carroll v. Junker,* 79 Wash.2d 12, 482 P.2d 775, 784 (Wash.1971)); *see In re Levon,* 124 Md.App. at 143, 720 A.2d 1232; *In re Lorne S.,* 123 Md.App. at 680, 720 A.2d 920.

## I.

### A.

Section 808(c)(2) provided that "As an absolute limit against any one child, his parents, or both, a judgment rendered under this section may not exceed $10,000 for *all acts arising out of a single incident.*" (Emphasis added).

The juvenile court interpreted the phrase "single incident" as follows:

For the purposes of this case, I hold that each time [John M.] went into either girl's bedroom or bed, and fondled them, uh, is a single incident. That is for each child, each time. That is each touching of either the the [sic] children is a single incident.

. . .

That he would be ordered to pay, as they are presented, the therapy bills for each child. The limit, since there must be a limit, would be however many incidents there were, times $10,000. Cause it says here, out of a single incident. And because he was apprehended, and . . . each of these petitions against him has thirteen counts. . . .

So, I'm not saying that there are thirteen incidents, there are . . . at least by his admission I think five or six.

Now, it may be that we'll never reach any number as large as $50,000 or $60,000. I certainly hope for the sake of these girls that that's never reached, because I think that it would indicate some very serious effects on them, which I hope will not, have not occurred.[3]

John M.'s contention regarding the court's interpretation of "per incident" in the restitution statute is stated as follows:

At trial, there was argument regarding the meaning of "per incident" as it relates to Article 27, § 808. [The Juvenile Court] stated, after considering the statute, which the Court defined as, "That is each touching of either the the [sic] children is a single incident." This interpretation of "per incident" was clearly erroneous.

The primary rule of statutory interpretation is to ascertain and carry out the legislative intent, recognizing the goals to be served by the statute and the evils the legislature sought to remedy. *Giant Food, Inc. v. Department of Labor, Licensing & Regulation,* 356 Md. 180, 738 A.2d 856 (1999); *In re Lorne S.,* 123 Md.App. at 677–678, 720 A.2d 920. The words in the statute should be given "their ordinary and

---

**3.** The juvenile court several times referred to the number of acts to which John M. pled "involved" as five or six, but the record shows that John M. pled involved to five counts of child abuse and to three counts of sexual offense in the third degree. Section 808(a)(1)(iii) provided for restitution for counseling expenses if the "delinquent acts" involved, *inter alia,* child abuse or sexual offenses in any degree. 1997 Md. Laws 311. As interpreted by the juvenile court, each of the eight counts to which John M. pled "involved" triggered the potential of $10,000 in restitution.

natural meaning." *In re Lorne S.,* 123 Md.App. at 677–678, 720 A.2d 920; *see also In re Christopher R.,* 348 Md. 408, 411, 704 A.2d 443 (1998). "If the language of the statute is plain and clear and expresses a meaning consistent with the statute's apparent purpose, no further analysis is ordinarily required." *In re Lorne S.,* 123 Md.App. at 678, 720 A.2d 920 (citations omitted). In addition, because it is in derogation of the common law, the statute must be strictly construed. *In re Zephrin D.* 69 Md.App. at 759, 519 A.2d 806.

Although the General Assembly has increased the amount of restitution from time to time, the limitation language has remained consistent. In determining its meaning, it is appropriate to focus on the whole of the limitation section, which reads as follows:

(c) *Limitations on judgment.*—(1) A judgment rendered under this section may not exceed:

(i) As to property stolen, destroyed, converted, or unlawfully obtained, the lesser of the fair market value of the property or $10,000;

(ii) As to property damaged, or substantially decreased in value, the lesser of the amount of damage or the decrease in value of the property not to exceed the fair market value of the property or $10,000; and

(iii) As to personal injuries inflicted, the lesser of the actual medical, dental, hospital, funeral, and burial expenses incurred by the injured person as a result of the injury or $10,000.

(2) As an absolute limit against any one child, his parents, or both, a judgment rendered under this section may not exceed $10,000 for all acts arising out of a single incident.

Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 808(c).

Although it is possible that victims of juvenile acts may be made whole financially by the permitted restitution, that is not a given under the statute. Whether the damages relate to property or to personal injury, the measure of damages is expressly limited to the lesser of fair market value or $10,000 in the case of property offenses and to the lesser of "actual"

expenses or $10,000 for all acts arising out of a "single incident."

An "incident" is "[a] definite and separate occurrence; event." THE AMERICAN HERITAGE DICTIONARY 650 (1985). In the context of "all acts arising out of a single incident," "single incident" is more logically read to mean a separate occurrence defined by time and location, rather than each individual act committed during the incident. This more expansive definition of "incident" is consistent with the "all acts" language, which suggests that damages occasioned during a particular incident may result from different acts. When subsection (2) is read in context with subsection (1), which limits different types of damages, the "absolute" limit obviously contemplates multiple types of damages, ·i.e., property damage or personal injury, and even multiple victims.

In *In Re John H.,* 49 Md.App. 595, 433 A.2d 1239 (1981), *aff'd,* 293 Md. 295, 443 A.2d 594 (1982), this Court was confronted with acts of vandalism involving damages in the approximate amount of $450,000 to schools in Baltimore County.. The trial court entered judgment against the parents of the involved juvenile in the amount of $10,100. A "Statement of Facts," signed by the parties, stated that

the Lutherville Elementary School was unlawfully entered by John H. between the hours of 6 p.m. on Saturday, October 13, 1979, and 9 a.m. on Sunday, October 14, 1979; that the Ridgely Junior High School was unlawfully entered on November 11, 1979, between 2 a.m. and 3 a.m.; and that the Lutherville Elementary School was unlawfully entered between November 10, 1979, at approximately 8 or 9 p.m. and November 11, 1979 at approximately 4:20 a.m.

*Id.* at 604, 433 A.2d 1239. The trial court found that the juvenile "had destroyed the property of the Board of Education of Baltimore County on three separate *occasions,* in excess of $5,000.00 [the then "single incident" statutory limit] on two of the occasions and in the amount of $200.00 on the third *occasion." Id.* at 604, 433 A.2d 1239 (emphasis supplied).

The parents contended that the damages on the evening of November 10 and the early morning of November 11 arose out of a single incident. The Court found that the damages did not arise out of a single incident. In a footnote, the Court said:

> Section 3–829(b)(4) provides 'As an absolute limit against any one child or his parents, a judgment rendered under this section may not exceed $5,000 for all acts arising out of a single incident.' In this case there were three separate incidents: (1) damages inflicted between October 13, 1979, and October 14, 1979, at Lutherville Elementary School; (2) damages inflicted between November 10, 1979, and November 11, 1979, at Lutherville Elementary School; and (3) damages inflicted on November 11, 1979 at Ridgely Junior High School.

*Id.* at 597, 433 A.2d 1239.

We conclude that the most consistent interpretation of what constitutes a statutory incident in this case is each occasion where appellant babysat the victims in their home rather than each act committed during those visits. Each visit constituted a separate episode in a series of related events. Damages resulting from all acts committed during each visit are subject to the limitation of $10,000. Assuming five separate incidents involving abusive acts, the maximum restitution exposure is $50,000. If the acts for which a plea was entered were all committed on the same occasion, however, restitution is limited to $10,000. It would appear that the acts were repeated as to each victim on each occasion, but because of the petitions that were filed, we cannot associate dates with the offenses to which a plea was entered and relate them to a particular babysitting incident.[4] To the extent that that becomes an issue, it can be addressed on remand.

---

4. The counts within the petitions are not date specific because of "... the age of the victims and continuing nature of the offenses more specific times are unavailable." *See State of Maryland v. Cooksey,* 128 Md.App. 331, 738 A.2d 298 (1999).

## B.

John M. also contends that the State produced "no evidence to support the need for future counseling" for the girls. Even if the victims do need counseling, John M. contends, the evidence was insufficient to demonstrate that his actions were the cause of their need. In addition, he argues that the court could not award restitution for therapy in excess of the sums actually expended by a victim.

Without question, the juvenile court was presented with evidence that would support the possible need for future counseling. The court heard extensive testimony from the victims' counselors. First, Audrey Kramer, a licensed clinical social worker and the counselor for Victim # 2, was accepted as an expert in counseling child sexual abuse victims. She testified that Victim # 2 had difficulty sleeping and was frightened that someone would come into her room. In Ms. Kramer's opinion, this was connected to the girl's fear of being abused. Ms. Kramer also testified that Victim # 2 still had feelings of guilt and shame about the abuse, and was afraid that if friends or relatives found out about the abuse they would not like her. Ms. Kramer believed that these feelings of shame created the need for additional therapy. The therapist also testified that Victim # 2 might need additional therapy because, as the girl progressed through different developmental stages, her perceptions of sexuality, intimacy, and individuality might be affected by her experience of being abused. This "sleeper effect", through which past traumas that have seemingly been conquered can reappear when the individual faces new stimuli, can influence victims of molestation at different stages in their lives, including pre-adolescence, adolescence, pre-marriage, and at childbirth, i.e., at "times when the individual's sexuality becomes an issue." As a result, Ms. Kramer testified, Victim # 2 might need intermittent therapy, starting again when the girl reacted adversely to new and challenging experiences and stopping when the girl was able to handle those challenges without being emotionally dominated by her traumas.

Sheila Gart, Victim # 1's counselor, testified and was accepted as an expert on child sexual abuse and therapy. Victim # 1, who was four years old when she was abused, told Ms. Gart that she did not remember John M. molesting her. John M., however, admitted to the police that he touched Victim # 1's genitals at least five times. In addition, Victim # 2 said that she heard her younger sister screaming after John M. went into her bedroom. Ms. Gart testified that the fact that Victim # 1 said she did not remember the abuse was somewhat belied by the girl's behavior during the counseling sessions, which demonstrated Victim # 1's fears about not being safe in her own room and not being safe with people she had previously trusted (John M. is the girls' cousin). Ms. Gart testified that some fears are common for four-year old children, but that sexual abuse makes the fears more intense and debilitating.

Victim # 1 also appeared mentally to "shift" the abuse that she had suffered onto her older sister. Ms. Gart testified that Victim # 1 said that John M. would abuse her older sister, "and she [Victim # 1] would, when he had come to her room, she had said stop, and he had run away." Ms. Gart stated that she did not think it was possible that Victim # 1 truly did not remember being abused, and that the four year-old girl's depiction of herself as stopping the abuse of her older sister indicated that Victim # 1 might be in self-denial about what had happened. Ms. Gart testified:

> Well, she remembers that, that things happened at night, because she talks about saying that she was protecting her sister. And as I've said, it could be a shifting to the sister to not deny, but uh, to protect herself. And maybe it was traumatic enough for her that she did not want to say that it happened to me, but it happened to my sister.

Ms. Gart stated that the "sleeper effect" may cause Victim # 1 to need counseling in the future. Specifically, Ms. Gart said that sexual trauma usually causes behavior in "the aggressive or sexual area[s]" that requires further counseling at different stages of a child's maturation. Ms. Gart estimated that, in the best case scenario, Victim # 1 would need therapy

for about eight months to one year when she reached adolescence, and in the worst case scenario the girl might need therapy once a week for a three or four year period during her teenage years.

Gavin Behrens, the clinical director of CPC Health, the clinic where the girls were counseled, was also accepted as an expert witness on the subject of child abuse and therapy. He testified about the CPC Health's billing procedures, and discussed future projections for the costs of the counseling. Although he had not counseled these victims, he agreed that therapy is often necessary at various stages of a child's development.

In restitution cases "there must appear in the record at the restitution hearing not only the judicial findings that are a prerequisite to liability, but sufficient evidence to support those findings." *In re Dan D.*, 57 Md.App. 522, 528, 470 A.2d 1318 (1984). The Juvenile Court heard extensive evidence about the girls' need for counseling and based on that testimony the court could find a causal connection between John M.'s act and the counseling incurred to date. Although the evidence also would support a finding of a possible need for future counseling, there is an issue created regarding the causal effect of John M.'s acts and future expenditures.

John M. cites *In re Jason W.*, 94 Md.App. 731, 619 A.2d 163, *cert. denied*, 332 Md. 510, 632 A.2d 767 (1993), as support for his argument that the girls' future counseling needs are not connected to his abuse. *In re Jason W.* concerned restitution for a police car which had been wrecked by an officer pursuing a fleeing juvenile. We reversed the Juvenile Court's finding that the juvenile was responsible for the cost of the car. We stressed the active tense of the restitution statute, which at that time was C & J § 3–829(a), and held that the juvenile had not actually caused the damage. The police officer's failure to control the car was the actual cause of the damage, and the juvenile was therefore not liable for restitution. *Id.* at 737, 619 A.2d 163. At least, at this point in time, there is no third party or intervening cause associated with whatever trauma the victims have experienced.

Although we are not aware of any juvenile case in Maryland that has presented this particular factual scenario, the problem created by restitution requests for undetermined and not yet incurred expenses has recently been addressed in Arizona. In *In re Alton D.*, 193 Ariz. 98, 970 P.2d 452 (1998), a juvenile was adjudicated delinquent after admitting to criminal trespass, a felony in Arizona. The reported opinion does not state the nature of the juvenile's acts, but as part of his admission agreement the juvenile agreed to pay restitution not exceeding $3,000. The juvenile court's disposition order imposed a deadline, two months after the date of the order, by which victims could submit restitution requests. The State appealed, arguing that Arizona's statutes provide that juveniles are required to "make full or partial restitution to the victim," and that the juvenile court retained jurisdiction over the juvenile to impose restitution in the more distant future, after considering victims' claims "if and when they are submitted." *Id.* at 453. The Court of Appeals of Arizona held that the juvenile court could impose a reasonable deadline for restitution claims in order to give the juvenile a speedy disposition from which to appeal, but the terms of probation could be modified to include restitution payment orders even after the deadline for including restitution amounts as part of the initial disposition. These latter modifications would be separately appealable orders. 970 P.2d at 456–457. The Court observed that

[t]reating any subsequent modification order as a separately appealable order … promotes the victim's right to be made whole and also affords the juvenile prompt rehabilitative treatment, which includes restitution, in a speedy and effective manner. A juvenile is normally not placed on probation for a period longer than one year. The victim's claim for a specific amount of restitution would necessarily be limited to that time, after which the juvenile court would lose jurisdiction over the juvenile.

\* \* \*

The juvenile is not delayed in his ability to appeal from the initial disposition, and is afforded a separate right of

appeal from the subsequent modification order imposing the amount of restitution as a term of probation. The victim cannot bring a claim for restitution after the juvenile court has lost jurisdiction after the juvenile's successful completion and termination of probation....

This procedure affords the juvenile a timely appealable initial disposition that promptly begins his rehabilitative treatment. At the same time, the victim is afforded an adequate opportunity to compute accurately and fully the economic value of the loss. We can foresee many situations in which the victim would be unable to ascertain a specific amount of restitution in the time specified by the juvenile court's necessarily short initial dispositional "deadline." For example, if injuries requiring medical treatment were involved, the valuation of the victim's economic loss might not be readily apparent within such a limited period of time as the . . . [thirty to forty-five day period in which juvenile cases in Arizona had to proceed to disposition]. In the interests of providing the juvenile with a prompt disposition, we should not foreclose entirely the victim's right to be compensated, particularly when the juvenile has agreed to pay restitution up to a capped amount, and has been placed on a reasonably short period of probation.

The effect of our approach . . . is to place the burden on the juvenile to make any objection to a subsequent order of restitution by appeal from that order, rather than to require the victim, or the state on behalf of the victim, to assert that the juvenile court abused its discretion in imposing a deadline foreclosing future restitution as "unreasonable" under the victim's circumstances. We believe, in light of the goals of restitution as both rehabilitative to the juvenile and compensatory to the victim, that this is where the burden belongs.

*Id.*, 970 P.2d at 456–457.

■ Although the juvenile court made a laudable attempt to implement a final and lasting solution to the costs that the

victims may incur because of John M.'s actions, statutory limitations and due process considerations do not permit an order of restitution for counseling expenses that are not yet certain to occur.[5] We are mindful that the restitution statutes, because they are penal in nature and modify the common law, need to be strictly construed. The statute provided that the juvenile court may award restitution for "reasonable counseling expenses from a licensed health care provider" when the delinquent act has "[c]aused the victim of the delinquent to incur" such expenses. § 808(a)(i)(iii). Our observation in *Zephrin* that "[t]here is no provision under [the restitution statute [6]] for an award for those ordinary tort damages such as pain and suffering, loss of income or future losses and future medical expenses," while not essential to the holding in that case, is instructive. *In re Zephrin D.*, 69 Md.App. at 761, 519 A.2d 806.

Restitution in juvenile proceedings may not always make a victim whole and is not intended to be a substitute for a possible civil suit brought by or on behalf of a victim. *Id.* at 761–763, 519 A.2d 806. The juvenile court only has the ability to award restitution for reasonable sums that have already been incurred that are causally related to the juvenile's delinquent acts. Thus, an award for counseling expenses already incurred was appropriate, but not the award for the then future counseling expenses.

On remand the juvenile court should determine, in light of the victims' current counseling progress and their prospects for further counseling, the amount and structure for any future restitution award for counseling expenses John M. has

---

**5.** In its remarks from the bench during one of the restitution hearings, the juvenile court mentioned a process in which individual amounts drawn from the restitution award to pay for counseling as that counseling occurred could be challenged by John M. and his mother if they believed that the funds were not necessary for the girls' recovery from the trauma caused by John M. Such a process was not incorporated in its Final Order and no opinion is expressed regarding the appropriateness of such a procedure.

**6.** At that time, C & J § 3–829.

caused the victims to incur. We note, without deciding, that the court has the authority to continue a restitution hearing for "good cause" and that continuance for the presentation of ongoing counseling expenses in a situation such as this may be appropriate. In fashioning the restitution award, the court should award counseling expenses that have been incurred, and the court must preserve to John M. and his mother the ability to challenge the reasonableness of the expenditures and the causal connection to John M.'s delinquent acts.

## II. and V.

John M. and his mother both argue that their "due process rights were violated by the lack of notice of the amounts demanded as restitution by the victims." John M. concedes that he had notice of the claim for restitution for $5,795 in counseling fees for sessions that occurred before the autumn of 1997. John M. contends, however, that he was not notified until December 19, 1997 of the additional amounts requested by the State as restitution, and that he was therefore unable to prepare a defense to those claims. Regarding his mother, John M. quotes the former § 807(m)(3), which provided that "a court may not issue an order of restitution against a parent under this section unless the parent has been afforded a reasonable opportunity to be heard and present appropriate evidence on the parent's behalf." [7]

Due process requires that a juvenile receive notice of the restitution being claimed and a reasonable opportunity to present evidence relating to the issue. *In Re James B.*, 54 Md.App. 270, 278, 458 A.2d 847 (1983). In *James B.*, we held that due process was denied when the juvenile had notice that the State would attempt to prove damages of $331.55, but did not know until the day of the hearing that an additional $120 of damages was being sought. We remanded the case for another evidentiary hearing to allow James B. to challenge the

---

7. There appears to be no explicit finding as to financial ability to pay the restitution awarded, but that issue has not been raised. John M.'s mother testified that her annual salary exceeds $600,000.

inclusion of the $120 in the restitution order. John M.'s situation is different. The Juvenile Court ruled on August 25, 1997, that each delinquent act would be treated as one incident, and the court remarked that the statutory limit of restitution was $10,000 per incident. Therefore, it was apparent that John M. and his mother potentially were liable for up to $80,000. The court then asked the parties if they would be willing to proceed immediately to determine the actual amount of restitution, and John M.'s counsel, after consulting with John M., stated on the record: "Your honor, we think it would be appropriate to postpone the remainder of the restitution hearing."

At the direction of the court, the State sent letters to John M. on October 17, 1997, laying out the expected content of the testimony of the State's witnesses regarding the victims' future counseling needs and detailing the projected costs of the counseling, with a combined projection for the two girls of $33,440. At the beginning of the December 19, 1997 hearing John M.'s counsel moved to dismiss the State's request for restitution, and listed as one of the grounds that John M. did not know how much the State was seeking. The State reminded the court that restitution had been extensively discussed at the previous hearings and that the State had notified John M. and his mother several times that it would be seeking restitution for the counseling. Two of these notifications were the "Notice to Parents" petition that was sent with the summons to John M. and his mother, and the State's petition of October 1997 detailing the expected testimony of its witnesses.

The State orally described, without contradiction, the restitution notices that it had sent. The State indicated that the notices included the "date, time and length of, length of treatment that the State is, that is the basis of the State's request for restitution. We also in open Court stated that we are seeking restitution for, for future counseling that these two girls may need.... And we notified [John M.] of that in writing, notified [John M.] of that in open court."

It is admitted, on the record, that John M. and his mother were present at the earlier hearing and had "notice of what's going to be discussed at this hearing." The Juvenile Court denied the motion to dismiss the request for restitution. The court proceeded to hear testimony from Ms. Kramer, Victim # 2's counselor, about Victim # 2's need for further counseling. The rest of the hearing was postponed because John M.'s counsel had another commitment that afternoon; the date for resumption of the hearing was April 6, 1998.

 As the State points out, John M. therefore had four months notice between the hearings on August 25, 1997, and on December 19, 1997, and two months notice from the letters sent on October 17, 1997, to the December 19 hearing. In addition, John M. had three and a half months after the December 19 hearing to prepare for the resumption of the restitution hearing on April 6. Unlike the respondent in *In re James B.*, John M. had ample time to prepare for the restitution hearings, and ample notice of the amounts that would be sought. John M. had constructive notice on August 25, 1997, when the court ruled that John M. was liable for $10,000 times the number of counts to which he had pled involved. By October 1997 John M. had clear notice of the grounds of the State's restitution claim. When the juvenile court eventually established restitution in July 1998, it ordered $5,795 for the counseling received before the beginning of the restitution hearings, and an additional $32,505: $585 for counseling that Victim # 2 had received during the spring of 1998, while the final hearings were occurring, and $31,920 to be placed in escrow for future counseling. $32,505 is less than $33,440, the amount for which John M. was put on notice by the letters of October 17, 1997.

 John M.'s mother had the same notice as was provided John M. The requirement of the former § 807(m)(3) that she be provided "a reasonable opportunity to be heard and present appropriate evidence" was fully satisfied. She contends that, at an early stage of the proceedings in the juvenile court, she received a notice that included the previous maxi-

mum amount of restitution of $5,000 per incident. It is untenable for John M. and his mother to contend that the mother could have attended any of the hearings in the juvenile court, which she did, and not be on notice of an exposure of $10,000 per incident. That limit was the topic of a large amount of debate in the juvenile court, and John M.'s counsel was a very active participant in the debate. Moreover, all of the State's correspondence with John M. and his mother, other than that initial correspondence that referenced the outdated limit, set forth the maximum amount available as $10,000 per incident.

John M.'s mother testified that she is a partner at the Arthur Anderson Consulting firm. Certainly, she is a reasonably intelligent person and, as such, would have had ample notice that the limit of restitution was $10,000 per incident, as interpreted by the juvenile court on August 25, 1997. The Juvenile Court did not abuse its discretion by denying the motion to dismiss the restitution claims for lack of notice.

### III.

On September 24, 1997, John M. moved to compel mental examinations of the victims by a counseling/abuse expert hired by John M. The juvenile court heard arguments on the issue on October 20, 1997, before denying the motion. John M. contends that the court's denial was an abuse of discretion, as an examination of the victims by an expert hired by John M. was necessary to establish the gravity of the victims' injuries and to ascertain how much counseling they would need in the future.

In his motion, John M. relied on Md. Rule 2–423, which concerns mental and physical examinations during discovery in civil cases in circuit court. Rule 2–423, however, does not apply to juvenile cases. Md. Rule 1–101(b). Although juvenile proceedings are civil in nature, they are governed by the rules of procedure contained in Chapter 11 of the Maryland Rules. Md. Rule 1–101(b); *see also In re Victor B.*, 336 Md. at 95–96, 646 A.2d 1012. The rules related to

juvenile proceedings contain no specific provisions for the examination of victims, nor is there any such provision in § 808. There is also no provision for the examination of victims in Rule 11–109.a.3, which addresses discovery by the respondent in juvenile proceedings.

The juvenile court correctly held that "[t]here's nothing which either requires it, or precludes it, it isn't specifically provided for in the statutory scheme." We review the court's decision to determine whether it abused its discretion. The court considered the circumstances of John M.'s request for an examination of the victims, and found that there were adequate alternatives to an examination. John M.'s expert could review the testimony of the girls' therapists, assist in the cross-examination of the therapists when they testified as the State's experts, and testify to offer opinions in contradiction of the State's witnesses.

The juvenile court also recognized that the examinations John M. sought might have a harmful effect on the victims:

> I regard that there is a danger that exists, that a new therapist, a different therapist, probing into the areas of what happened to these little girls, potentially and unintentionally could upset the current therapy. And after all, money aside, rehabilitation of the Respondent aside, it seems to me that we should not in any way, inhibit, obstruct or destroy the ongoing therapy that these children are in.
>
> * * *
>
> And I, I have a great concern, that in the course of probing, into the issues, uh ... in this case, a therapist could unintentionally disturb the current therapy, or upset the child. And obviously these are areas, when you're involved in the sexual abuse of a five and six year old child, which these children currently are, it's a very delicate situation. And it involves the rest of their lives.

The court acknowledged that the potential restitution was substantial, and that John M.'s counsel would have "every opportunity" to argue the reasonableness of the proposed

restitution and the connection between John M.'s abusive acts and the girls' continued need for therapy. John M. did not demonstrate that the means suggested by the court to allow him expert evaluation of the restitution requests were insufficient to protect his interests, or that the examinations he sought were medically or legally necessary, or that they would aid in the proper resolution of the case.

John M.'s counsel proffered the name of the person he proposed to conduct the examinations. When the court asked if the proposed witness was experienced in the topic of sexually abused children, John M.'s counsel replied: "I believe so Your Honor, but I can't say for certain." When the court asked if the proposed expert had told John M.'s counsel that the examinations could be done without harming the children, John M.'s counsel responded: "I don't have a specific . . . I've only given her a thumbnail." John M.'s counsel said that the proposed witness believed an evaluation would be appropriate, and counsel stated, "I can infer from that that she thought it would be non-intrusive."

The court asked if the proposed witness had stated that a face-to-face interview would be preferable to another type of fact-finding, such as reviewing records or talking to the girls' therapists, and John M.'s counsel replied that he "hadn't been in a position to offer her one or the other," but it was *his own* "considered opinion" that personal interviews were necessary. Finally, in his closing remarks, John M.'s counsel conceded that the proposed witness "may decide that one [child] should be interviewed and one shouldn't. She may decide that the doctor's notes and therapist's are sufficient. . . ." Thus, there was no demonstration that the interviews were essential, that they would not be harmful to the girls, or that they would necessarily aid the trier of fact in making a decision. The court did not abuse its discretion by denying the motion to compel examinations.

## IV.

On September 21, 1998, the juvenile court granted the State's motion to enforce the restitution order that the court

had issued on July 23, 1998. On November 24, 1998, the court denied John M.'s Motion for Reconsideration.

John M. argues that the court erred by refusing "to stay execution of enforcement of the judgement against John M.'s mother." John M. cites "§ 808(1)" for the proposition that a person owed restitution may not execute on a judgment recorded and indexed under the restitution statute if the person liable to pay the restitution files a motion to stay execution of the order of restitution and challenges the order of restitution by filing an appeal. The language John M. quotes corresponds to former § 807(*l*), and the current § 807(k). Both the previous and the current version of § 807 apply to "a judgment recorded and indexed under this section," i.e., under § 807. In this case, there has been no judgment recorded and indexed, and thus the provision is inapplicable. Moreover, John M. never made a motion to stay judgment, so he has not availed himself of the protection from execution offered by the former § 807(*l*) and the current § 807(k).

Notwithstanding what we have said in response to question four, however, monies which have been paid may be subject to return to appellants pursuant to the provision of this opinion related to the first question discussed. Any money paid for expenses incurred that are causally related to John M.'s acts and within the per incident limitation, however, would not need to be returned but would need to be properly credited against the ultimate restitution award.

## VI.

Section 808(d) provided that "[a] restitution hearing to determine the liability of a parent, a child, or both, shall be held not later than 30 days after the disposition hearing and may be extended by the juvenile court for good cause." John M. contends that the juvenile court abused its discretion by granting the State's request for a continuance of the restitution hearing held on August 25, 1997. This issue, however, is not preserved for appeal. At the August 25, 1997, hearing,

the Juvenile Court made a preliminary ruling that a maximum restitution of $10,000 was possible for each abusive act or sexual offense perpetrated by John M. After that ruling, the following exchange occurred:

> THE COURT: . . . So, do you want to continue the hearing, have the dollars and cents put on or do you not?
>
> MR. SHAPIRO [John M.'s counsel]: Uh, I would like to consult with my client.
>
> THE COURT: Certainly.
>
> MR. SHAPIRO: Your honor we think that it would be appropriate to postpone the remainder of the restitution hearing.
>
> THE COURT: Okay. Then we'll do that. We'll set a restitution hearing in thirty days.

Although John M.'s counsel had stated, earlier in the hearing, that restitution should be determined on that day, it was John M. and his counsel who requested that the court "postpone the remainder of the restitution hearing." As such, John M. clearly waived the issue of whether the hearing was properly postponed. *See* Md. Rule 8–131(a).

Even were the issue of the postponement preserved, we would find good cause for postponement, as the parties had been able to hear testimony from only one of the three expert witnesses from the CPC Health. Their testimony was vitally important to an understanding of the psychological and emotional harm done to the girls, and the court therefore would have had good cause to postpone the hearing.

**JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO THE DISTRICT COURT OF MARYLAND FOR MONTGOMERY COUNTY, SITTING AS A JUVENILE COURT, FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID ⅚ BY JOHN M. AND HIS MOTHER AND ⅙ BY APPELLEE.**